# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 04-3629 to 04-3636

FIDELITY NATIONAL TITLE INSURANCE COMPANY
OF NEW YORK,

*Plaintiff-Appellant,*

*v.*

HOWARD SAVINGS BANK, *et al.*,

*Defendants-Appellees.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 02 C 643-44, 646-47, 649, 651, 667-68—**William J. Hibbler**, *Judge.*

_____

ARGUED NOVEMBER 7, 2005—DECIDED FEBRUARY 9, 2006

_____


Before POSNER, EASTERBROOK, and WOOD, *Circuit Judges.*

POSNER, *Circuit Judge.* Before us is an appeal in a series of diversity suits (which for the sake of simplicity we'll treat as one) against a number of Chicago banks by a title insurance company under the Uniform Fraudulent Transfer Act, in force in Illinois as 740 ILCS 160. On the defendants' motion for summary judgment, the district judge dismissed the suit as barred by the Act's statute of limitations. 740 ILCS 160/10.

Fidelity insured escrow accounts that were controlled by Intercounty Title Company, which conducted real estate

closings, placing the purchase money in escrow until the sale closed. Intercounty's owners had the company remove money from the escrow accounts and use it to buy certificates of deposit from the defendant banks. The company pledged the certificates to secure personal loans that the banks made to the owners, and then directed the banks to sell the certificates of deposit and use the proceeds to discharge the loans that the banks had made to the owners. Thus the owner-borrowers got to keep the money they had borrowed from the banks (because the banks had repaid themselves by selling the certificates of deposit), and in this fashion money in the escrow accounts was funneled to them. This was only one of the methods that Intercounty's owners used to plunder the escrow accounts; others are described in *Fidelity National Title Ins. Co. v. Intercounty National Title Ins. Co.*, 412 F.3d 745 (7th Cir. 2005).

Fidelity wants to recover from the banks the money that was diverted to them (for the purchase of certificates of deposit) from the escrow accounts. It argues that the banks received this money without giving consideration to the equitable owners of the money—the people who had deposited their purchase money in escrow accounts controlled by Intercounty. Those people—and their insurer, Fidelity—received neither the certificates of deposit nor anything else of value from the banks, while the banks received money from the escrow accounts in exchange for the certificates of deposit. Fidelity does not contend, however, that the banks' action in setting off the certificates of deposit against the Intercounty insiders' debts (which they did by selling the certificates and applying the proceeds to those debts) was a fraudulent transfer, though it was a critical step in the transfer of money from the escrow accounts to the insiders.

The banks sold the last of the certificates of deposit to Intercounty in 1995, but it was not until 2000 that Fidelity learned that money was missing from the escrow accounts that it had insured. The missing amount was huge—as much as $50 million, or even more. Fidelity began an investigation to determine the whereabouts of the missing money. The investigation revealed that Intercounty had bought a certificate of deposit from a bank named Banco Popular to fund a statutory bond that Intercounty had to post, but that instead of posting it Intercounty had used the certificate of deposit as security for a personal loan that Banco Popular had made to one of Intercounty's owners. In December of 2000, Fidelity filed suit under the Uniform Fraudulent Transfer Act against Banco Popular, but it is not one of the suits consolidated in the present litigation.

Later that month Fidelity interviewed George Stimac, Intercounty's controller, who confirmed that Intercounty had invested escrow funds in certificates of deposit purchased from various banks. According to notes of the interview that were taken by one of Fidelity's investigators, Stimac "understands (apparently through office scuttlebutt) that the CDs were sometimes pledged for personal use." Stimac did not know which banks had sold those certificates of deposit, but a search of Intercounty databases produced a list of them and subpoenas to the banks resulted in Fidelity's learning which banks had liquidated the certificates of deposit that had been sold by them to Intercounty and then pledged to them by Intercounty to secure personal loans. By the end of January 2001, Fidelity had identified all but two of the banks that it has sued in this litigation, but it did not file the suit until January of the following year.

The Uniform Fraudulent Transfer Act requires that suit be brought within four years "after the [fraudulent] transfer was made" or, "if later, within one year after the transfer . . .

was or could reasonably have been discovered by the claimant." 740 ILCS 160/10. The transfers of escrow money to the defendant banks occurred more than four years before Fidelity sued, so the suit was timely only if brought within a year after Fidelity discovered or could reasonably have discovered the transfers. By the time its investigators interviewed Stimac, which was more than a year before it sued, it knew that banks had participated in transactions that had resulted in escrow money being improperly diverted to Intercounty's owners. It had already sued one of those banks—Banco Popular—and it had learned from Stimac that probably there were others. It knew that fraudulent transfers had occurred, because a great deal of money was missing from the escrow accounts and no explanation was forthcoming other than that it had been stolen by Intercounty's owners. It particularly knew that fraudulent transfers *as it understands the term* (incorrectly, as we'll see) had occurred, because it thinks that any money originating in the escrow accounts that passed through a bank en route to Intercounty's owners was a fraudulent transfer to the bank.

Apart from Banco Popular, Fidelity did not know who the transferees were. But when a statute of limitations does not begin to run until "discovery," the discovery referred to is merely discovery that the plaintiff has been wrongfully injured. E.g., *Golla v. General Motors Corp.*, 657 N.E.2d 894, 898 (Ill. 1995); *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 633 N.E.2d 627, 630-31 (Ill. 1994); *Evans v. City of Chicago*, 2006 WL 29209, at *12 n. 28 (7th Cir. Jan. 6, 2006) (Illinois law). He doesn't have to know who injured him. He has the limitations period to discover that, draft his complaint, and file suit. If despite the exercise of reasonable diligence he cannot discover his injurer's (or injurers') identity within the statutory period, he can appeal to the doctrine of equitable

tolling to postpone the deadline for suing until he can obtain the necessary information. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-52 (7th Cir. 1990).

Now admittedly it is still unresolved whether Illinois recognizes equitable tolling. *Clark v. City of Braidwood*, 318 F.3d 764, 767 (7th Cir. 2003). The Illinois cases that mention the term seem to mean by it equitable estoppel, *Chicago Park District v. Kenroy, Inc.*, 402 N.E.2d 181, 184 (Ill. 1980); *Medical Disposal Services, Inc. v. EPA*, 677 N.E.2d 428, 433 (Ill. App. 1996), a distinct doctrine governing cases in which the defendant misleads the plaintiff into thinking that he doesn't have to sue yet, or in some other way prevents him from suing within the statutory period. Equitable tolling does not require that the defendant have borne any responsibility for the plaintiff's having missed the deadline.

There is no need to try in this case to answer the question whether Illinois accepts the doctrine of equitable tolling, though we venture the guess that it does (or would); it is a commonplace limitations doctrine and a sensible one. What is important is simply that once the limitations period has expired, any further extension is limited to the time necessary to find such additional information as the plaintiff absolutely needs in order to be able to file a suit. *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1213 (7th Cir. 1993); *Cada v. Baxter Healthcare Corp.*, *supra*, 920 F.2d at 453.

So the one-year "discovery" statute of limitations began to run in December 2000 (if not earlier), when Fidelity discovered (and surely by then should have discovered) that there had been fraudulent transfers from the escrow accounts that it had insured. Fidelity therefore had to sue by December 2001 unless it could not identify the transferees by then; in that event, Fidelity could appeal to the doctrine of equitable tolling for an extension. But in fact it learned

the identity of most of them by the end of January 2001, and it does not even argue equitable tolling. It is right not to because nothing prevented it from suing those defendants and adding others later as the facts about them emerged.

Fidelity argues, however, that the standard analysis of a discovery statute of limitations does not apply to the Uniform Fraudulent Transfer Act. As Fidelity points out, the "discovery rule" (the rule that makes the claim accrue on the date on which the plaintiff discovers that he has been the victim of a wrongful injury) is normally a judge-made graft on statutes of limitations that do not mention discovery, see, e.g., *Cada v. Baxter Healthcare Corp.*, *supra*, 920 F.2d at 451; *Lama v. Preskill*, 818 N.E.2d 443, 448 (Ill. App. 2004), while here the rule is stated in the statute. But we cannot fathom why that should make a difference in the content of the rule. Numerous statutes of limitations incorporate a discovery rule explicitly, and their discovery rule is interpreted the same way as the judge-made graft on the silent statutes is. E.g., *Golla v. General Motors Corp.*, *supra*, 657 N.E.2d at 898; *Gilbert Bros., Inc. v. Gilbert*, 630 N.E.2d 189, 192 (Ill. App. 1994); *SASCO 1997 NI, LLC v. Zudkewich*, 767 A.2d 469, 474-75 (N.J. 2001).

A more promising distinction is that between a fraudulent transfer and an ordinary tort, including fraud. The doctrine of fraudulent transfer creates a species of receiver liability. 740 ILCS 160/8(a); *Aps Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 629-30 (7th Cir. 2002) (Illinois law). When the owners of Intercounty diverted money in the escrow accounts to their own pockets, they committed a fraud. Had they then turned the money over to their adult children, who either suspected that the money they were getting had a tainted origin or provided no consideration for receiving the money, the children would have been the recipients of fraudulent transfers and would therefore have been liable

to Fidelity. *United States v. Engh*, 330 F.3d 954, 956 (7th Cir. 2003) (Illinois law); *Regan v. Ivanelli*, 617 N.E.2d 808, 815 (Ill. App. 1993); *Gary-Wheaton Bank v. Meyer*, 473 N.E.2d 548, 554 (Ill. App. 1984); *Harris v. Aimco, Inc.*, 383 N.E.2d 631, 633 (Ill. App. 1978). The fraudulent transfer does not occur, however, until money is handed to a person from whom the true owner can recover it by virtue of the doctrine. *Island Holding, LLC v. O'Brien*, 775 N.Y.S.2d 72, 74 (N.Y. App. Div. 2004). And this implies that the discovery statute of limitations does not begin to run until the plaintiff has discovered or should have discovered not that money has been transferred illegally but that it has been transferred to someone who is a fraudulent transferee, for otherwise it is not a fraudulent transfer and the owner of the money has no claim against the transferee.

But this just means that the mere fact of a transfer of funds to which one has a claim does not trigger a duty of investigation and thus start the limitations period running; there must be something fishy about the transfer. This doesn't mean that you have to know or have reason to know the identity of the transferee; you have the statutory limitations period to discover that, and if that isn't long enough you can fall back on equitable tolling. Nor does it mean, as Fidelity argues, that you have to know of the particular fraudulent transfers that have occurred. All you have to know or suspect is that such transfers are occurring; for knowing that, it is irresponsible to sit back and wait until the particular transfers are identified to you. Knowing that Banco Popular had received a fraudulent transfer (at least as Fidelity interprets "fraudulent transfer"), knowing that Intercounty had bought other certificates from other banks, and having reason to think that "scuttlebutt" about some of those certificates of deposit having been used to repay personal loans was reliable because it had been repeated by

Intercounty's controller, Fidelity should have known that fraudulent transfers not limited to Banco Popular had occurred. It therefore had only one more year in which to sue.

A statute of limitations is not intended to provide a period of rest and recuperation after the completion of the plaintiff's investigation. Fidelity had more than four years in which to discover that money in the escrow accounts that it had insured had been transferred fraudulently to specific banks. It did not require an additional 13 months to identify the specific transfers. The one-year limitations period that remained to it was ample. Had it not been adequate, Fidelity could as we have said have appealed to the doctrine of equitable tolling, and it has not tried to do so.

So the suit was properly dismissed. But for completeness and perhaps to head off some futile litigation against other banks, we address briefly the contention of two of the defendant banks that it is clear (without need for any further factual development) that there was no fraudulent transfer to these banks. When Intercounty bought certificates of deposit from the banks and pledged them as collateral for the loans the banks had made to Intercounty's owners, the company did not reveal to the banks, or cause them to suspect, that Intercounty was buying the certificates with escrow money. It told the banks it owed its owners the money they had borrowed, and it therefore directed the banks to liquidate the certificates and use the proceeds to repay the owners' loans. The bank merely acted as a transfer agent between Intercounty and the owners. There is nothing suspicious per se about a corporation's paying money to its shareholders, and as far as the banks knew, that was all that was happening.

Fidelity argues that the transfers to the banks of the money used to buy the certificates of deposit were fraudu-

lent because no consideration was given to the equitable owners of the money transferred, that is, to the owners of the escrow money and to Fidelity itself as their subrogee. But to be a fraudulent transferee, you must know or suspect that you are not giving any return value to the owner. 740 ILCS 160/9(a); *Kennedy v. Four Boys Labor Service, Inc.*, 664 N.E.2d 1088, 1093 (Ill. App. 1996); *Scholes v. Lehmann*, 56 F.3d 750, 759 (7th Cir. 1995) (Illinois law). As far as the banks knew, the money was owed by Intercounty to its shareholders, and the banks were giving full consideration for the receipt of the money by issuing the certificates of deposit.

Fidelity's theory of fraudulent transfer would cast a dark cloud over the banking business, and so it is not surprising that the theory has no legal basis. Fidelity cites a decision of ours for the proposition that the consideration for a transfer must flow to the true owner of the money transferred. *Scholes v. Lehmann*, *supra*, 56 F.3d at 758. The transfer held to be fraudulent in that case was to the ex-wife of the perpetrator of a fraud. She may have had valid claims against him arising from their divorce, and the release of those claims was urged as consideration for the transfer. But the transfer was not of the perpetrator's funds but of corporate funds, and the corporation received no benefit from the release of her personal claims against the perpetrator. Unlike the banks in this case, she *knew* she had no claims against the corporation—knew therefore that she was receiving corporate funds without any quid pro quo. See also *Wilkey v. Wax*, 225 N.E.2d 813, 814 (Ill. App. 1967). That knowledge, which made her a fraudulent transferee, is missing here.

AFFIRMED.

A true Copy:

    Teste:

                          _____

                          *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*