BRENNAN, J.
¶ 1 *584 This is an appeal of an order that granted summary judgment and dismissed as time-barred a WIS. STAT. § 242.04(1)(a) (2015-16)[1] claim alleging a fraudulent transfer. WISCONSIN STAT. § 893.425 bars "an action with respect to a fraudulent transfer or obligation under ch. 242" that is not commenced within one year after claimants "could reasonably have ... discovered" it. This case requires us to interpret what the legislature intended by *359 § 893.425 and to apply the statute to a motion for summary *585 judgment. The plaintiff argues that the statute creates a discovery-of-the-fraud rule-where the clock starts to run when the fraudulent nature of the transfer could reasonably have been discovered-and that the statute had not run on creditors' state law claims at the relevant point. The defendants argue that the statute creates a discovery-of-the-transfer rule-where the clock starts to run when the transfer could reasonably have been discovered-but that regardless of which rule is applied, the statute had run, and creditors' state law claims had expired.
¶ 2 We note at the outset that this state court action arises in the context of a federal bankruptcy case. Plaintiff is the Official Committee of Unsecured Creditors of Great Lakes Quick Lube LP (the Committee), a committee appointed in a federal bankruptcy case and given the right to pursue claims on behalf of the debtor's 140 unsecured creditors. Defendants are John W. Theisen, Tom Chambasian, and Chester J. Bojanowski (the Individual Sellers), who sold a company in a leveraged buyout to an entity that later filed for bankruptcy. The Committee alleges that two transactions made in connection with the sale of that company-the issuance of a note to each Individual Seller for one million dollars and the satisfaction of the notes as the debtor's financial condition was deteriorating-were fraudulent within the meaning of WIS. STAT. § 242.04(1)(a). The Committee is attempting to recoup for unsecured creditors the three million dollars the Individual Sellers received.
¶ 3 The specific question before us is whether summary judgment was properly granted to the Individual Sellers on the grounds that no individual creditor had a viable state law claim as of the date of the bankruptcy petition filing because the statute of limitations *586 on any such claims had run. To be entitled to summary judgment, the moving party must show that all of the creditors in question could reasonably have discovered the fraudulent nature of the transfer prior to April 2, 2011, such that each creditor's state law claim was extinguished by the date the bankruptcy petition was filed.[2] Conversely, to survive summary judgment, the Committee must show that at least one creditor (a "triggering creditor") had a valid state law claim on the date of the bankruptcy filing, which means here that at least one creditor could not reasonably have discovered the fraudulent nature of the transfer by April 2, 2011. As to such a creditor, the statute of limitations would not have run on its claim by the time of the bankruptcy petition filing, and that creditor would have had a valid state law claim at the time of the filing and could thus pursue it.
¶ 4 We conclude that the trial court erred in granting summary judgment to the Individual Sellers. First, it misconstrued the statute of limitations test to be one based on discovery of the transfer , as opposed to discovery of the fraudulent nature of the transfer . Second, it erred in concluding that the moving parties (the Individual Sellers) had shown that not one creditor had a timely state law claim as of the date of the bankruptcy filing. The trial court concluded that by April 2, 2011, at the latest, the discovery period had been triggered because by that point, "a reasonable creditor exercising *587 its duty to reasonably inquire would have discovered these *360 notes." It held that under either standard, the statute had run and the claims had expired. The trial court failed to apply the correct legal standard because its analysis did not apply the "triggering creditor" rule from bankruptcy law that governs this case. We therefore reverse the order for summary judgment and remand for further proceedings.
BACKGROUND
The parties and the underlying bankruptcy case.
¶ 5 For purposes of this appeal, we are concerned only with whether the Committee's claim is barred under the applicable statute of limitations, and not with the merits of the claim, so an extensive recitation of the facts is unnecessary. For the purpose of providing context, however, we briefly describe the circumstances surrounding the allegedly fraudulent transfer and the theory under which it is pursued.
¶ 6 The Individual Sellers are individuals who have been in the lube oil business for many years. They were owners of a company that operated oil change or "quick lube" businesses, first under the name "Speedy Lube" and later as franchisees of Valvoline Instant Oil Change. In September 2004, the Individual Sellers contracted with a buyer, Great Lakes Quick Lube LP, for the sale of their company's assets, including forty-seven quick lube stores and the real estate and leases associated with each store. The parties to this action disagree[3] about the nature of the promissory notes that were issued to the Individual Sellers on November 9, *588 2004, but the Committee acknowledges that "[t]he Seller Notes were unquestionably issued in November 2004 as part of the larger transaction involving the defendants selling their quick lube business to the Debtor." In November 2009, Great Lakes Quick Lube LP made full payments on the promissory notes to the Individual Sellers. Great Lakes Quick Lube LP subsequently filed a bankruptcy petition on April 2, 2012. Shortly thereafter, the bankruptcy court appointed the Committee, and the amended reorganization plan, effective February 13, 2013, authorized the Committee to pursue certain causes of action, including avoidance actions, on behalf of the unsecured creditors.
The fraudulent transfer claim.
¶ 7 Pursuant to its authorization under the plan approved by the bankruptcy court, the Committee filed its complaint in this case.[4] The Individual Sellers moved for summary judgment on the grounds that the claim was time barred.
¶ 8 *589 The trial court granted the motion for summary judgment in an oral ruling, concluding that the statute created a discovery-of-the-transfer *361 rule and *590 that the action was filed more than a year after the creditors represented by the Committee could reasonably have discovered the transfer. The Committee had argued that the statute created a discovery-of-the-fraud rule. The court rejected the Committee's construction of the statute. However, it further held that under either interpretation of the discovery rule, the Individual Sellers were entitled to summary judgment because the action was time barred because it was filed more than a year after any creditor could reasonably have discovered both the transfer and the fraudulent nature of the transfer. A written order was entered, from which a timely appeal was taken. *591 What is and is not in dispute in this appeal.
¶ 9 It is not disputed for purposes of this appeal that the Committee, through the reorganization plan and an assignment of rights by the debtor, has the right to bring this cause of action. The parties agree that *362 federal bankruptcy law establishes the framework under which the Committee operates and that under applicable law if any unsecured creditor represented by the Committee has a state law claim, the Committee, standing in the shoes of that creditor, can pursue that claim. See 11 U.S.C. § 544(b), In re Leonard , 125 F.3d 543, 544 (7th Cir. 1997) ("[I]f any unsecured creditor could reach an asset of the debtor outside bankruptcy, the Trustee [in this case, the Committee] can use § 544(b) to obtain that asset for the estate."). They agree that bankruptcy law recognizes a "triggering creditor" rule, which allows the Committee to attempt to avoid a transfer "if there is at least one creditor at the time who has standing under state law to challenge the transfer." Wieboldt Stores, Inc. v. Schottenstein , 94 B.R. 488, 506 (N.D. Ill. 1988). There is no dispute about the appropriateness of the venue. The parties agree that the outcome turns on the interpretation of WIS. STAT. § 893.425 and that no published Wisconsin case has addressed this question. They also agree that the discovery rule is applied using an objective rather than subjective standard. For purposes of this appeal at least, the sole point of disagreement is whether the Individual Sellers were entitled to summary judgment on the grounds that no creditor had a state law claim for fraudulent transfer at the time of the April 2, 2012 bankruptcy filing. *592 DISCUSSION
I. The discovery period in WIS. STAT. § 893.425 is triggered when claimants could reasonably have discovered the fraudulent nature of the transfer.
Standard of review and principles of law.
¶ 10 Whether the time limitation expired prior to the commencement of an action requires an interpretation of the relevant statutes. This is a question of law that we review de novo . K.N.K. v. Buhler , 139 Wis.2d 190, 198, 407 N.W.2d 281 (Ct. App. 1987). If we conclude that the pertinent statutory provisions are clear and unambiguous for the purposes of this appeal, we need not look beyond the plain language of the statute in reaching our decision. See J.A.L. v. State , 162 Wis.2d 940, 962, 471 N.W.2d 493 (1991). In interpreting statutes, we primarily focus on the statutory language. See State ex rel. Kalal v. Circuit Court for Dane Cty. , 2004 WI 58, ¶ 44, 271 Wis.2d 633, 681 N.W.2d 110. "[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id. , ¶ 46. We assume that the statutory language expresses the legislature's intent. See id. , ¶ 44. When it manifests a clear meaning, our inquiry ceases and we will apply that meaning. See Lincoln Sav. Bank, S.A. v. DOR , 215 Wis.2d 430, 443, 573 N.W.2d 522 (1998). Rules of statutory construction are inapplicable if the language of the statute has a plain and reasonable meaning on its face. State v. Engler , 80 Wis.2d 402, 406, 259 N.W.2d 97 (1977).
*593 The text of the statute.
¶ 11 The relevant provision of WIS. STAT. § 893.425, titled "Fraudulent transfers," states the following:
An action with respect to a fraudulent transfer or obligation under ch. 242 shall be barred unless the action is commenced:
(1) Under s. 242.04(1)(a)... within one year after the transfer or obligation is or could reasonably have been discovered by the claimant.
(Emphasis added.)
¶ 12 The Individual Sellers argue that the plain language of the statute-specifically *363 the fact that WIS. STAT. § 893.425(1)(a) does not repeat the word "fraudulent" before the word "transfer"-compels the conclusion that the point at which the statute starts to run is the point at which a claimant could reasonably have discovered the transfer even if there was no indication at that point that it might be fraudulent. They argue that canons of statutory interpretation deprive the court of the power to "add words" to the statute, citing Fond du Lac County v. Town of Rosendale , 149 Wis.2d 326, 334, 440 N.W.2d 818 (Ct. App. 1989). In that case, this court rejected an argument that would have limited the statute at issue by inserting the words "owned by the town" into a statute that was "silent about whether the streets and highways must be owned by the municipalities." Id. Similarly, the Individual Sellers argue that canons of interpretation require the court to give different meanings to terms "where the legislature uses similar but different terms in a statute[.]" See *594 Pawlowski v. American Family Mut. Ins. Co. , 2009 WI 105, ¶¶ 21, 22 n.14, 322 Wis.2d 21, 777 N.W.2d 67 (holding that the statute did not use "harbor" and "keep" interchangeably) and Graziano v. Town of Long Lake , 191 Wis.2d 812, 822, 530 N.W.2d 55 (Ct. App. 1995) (citation omitted) (holding that the statute did not use "authorize" and "direct" interchangeably).
¶ 13 The canons of statutory construction are of course well established. We do not agree, however, that the canons apply here in the way that the Individual Sellers suggest. WISCONSIN STAT. § 893.425 is entitled "Fraudulent transfers," and as it pertains to this action under WIS. STAT. § 242.04(1)(a), the relevant language reads as follows: "An action with respect to a fraudulent transfer or obligation under ch. 242 shall be barred unless the action is commenced ... within one year after the transfer or obligation is or could reasonably have been discovered by the claimant." Sec. 893.425(1) (emphasis added). The question is how to interpret the second use of the phrase "transfer or obligation."
¶ 14 Interpreting the statute's language "reasonably" and "not in isolation but as part of a whole" as we are required to do, see Kalal , 271 Wis.2d 633, ¶ 46, 681 N.W.2d 110, we conclude that the second use of the phrase "transfer or obligation" is referencing the phrase "fraudulent transfer or obligation" just a few words earlier. The use of the definite article ("the") in front of the second use of the phrase makes clear that it is referencing the antecedent "fraudulent transfer or obligation" already mentioned. The rule against adding words does not preclude such an interpretation because it does not result in adding the word "fraudulent" into a statute that is "silent" on the question. See Town of Rosendale , 149 Wis.2d at 334, 440 N.W.2d 818. The statute is very clearly about fraudulent transfers or obligations. To read it otherwise would be to read the words "in isolation." See *595 Kalal , 271 Wis.2d 633, ¶ 46, 681 N.W.2d 110. Likewise, there is no relevance here to the rule that when the legislature uses "similar but different terms in a statute," the words are assumed to have different meanings. See Pawlowski , 322 Wis.2d 21, ¶ 22 n.14, 777 N.W.2d 67. Unlike the statutes in the cases cited by the Individual Sellers, WIS. STAT. § 893.425 does not use different words. In fact, it uses the same words. The omission of the word "fraudulent" in the second half of the sentence does not mean that the legislature intended to suddenly reference a different kind of transfer than it was describing a few words earlier. The legislature also omitted the word "fraudulent" in front of the word "obligation," but it would be unreasonable to read the statute as *364 talking about anything other than "fraudulent obligations."
Other jurisdictions' interpretation of similar provisions of law.
¶ 15 As noted, no Wisconsin case has addressed the interpretation of the discovery rule for Wisconsin's Uniform Fraudulent Transfer Act, the statute under which this action was brought. However, the fact that the relevant provisions are part of a uniform act is relevant to our interpretation. More than forty states have adopted the Act. Badger State Bank v. Taylor , 2004 WI 128, ¶ 40, 276 Wis.2d 312, 688 N.W.2d 439. The legislature expressly stated its intent that the Act should be construed to accomplish uniformity "among states enacting it": "This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it ." WIS. STAT. § 242.11 (emphasis added). The question *596 raised in this case about the interpretation of the discovery rule has been addressed in many jurisdictions that have adopted the Uniform Fraudulent Transfer Act. It is proper to consider the holdings in these jurisdictions. See National Operating, L.P. v. Mutual Life Ins. Co. of N.Y. , 2001 WI 87, ¶ 30, 244 Wis.2d 839, 630 N.W.2d 116 (stating that Wisconsin may properly look to rulings from other jurisdictions that have enacted the Uniform Commercial Code in order to promote the uniformity of interpretation of U.C.C. provisions).
¶ 16 As the parties acknowledge, there is a split of authority among the jurisdictions that have considered the issue presented by this case. However, "the majority of other jurisdictions have consistently held that the one-year savings provision does not begin to accrue until the creditor discovers or could have reasonably discovered the nature of the fraudulent transfer ." State Farm Mut. Auto. Ins. Co. v. Cordua , 834 F.Supp.2d 301, 307 (E.D. Pa. 2011) (emphasis added).[5] The Individual Sellers downplay the significance of *597 non-Wisconsin authority, but in light of the legislative directive of WIS. STAT. § 242.11 we give consideration to these authorities.
¶ 17 In Freitag v. McGhie , the Supreme Court of Washington addressed this issue and the same arguments that the parties make in this case:
The sole issue in this case is whether [Washington's fraudulent transfer limitations statute] begins to run when the plaintiff first discovers or could reasonably discover the transfer , or when the plaintiff first discovers or could reasonably discover the fraudulent nature of the transfer .
....
Common sense and the statutory purpose of the [Uniform Fraudulent Transfer Act] necessitate a finding that the statute begins to run with the discovery of the fraudulent nature of the conveyance.
....
*365 Another purpose of the UFTA is to make uniform the law with respect to the subject of fraud among the states enacting it. In other words, the statute is intended not only "to establish greater uniformity in these limitations but also to reduce the time that is generally available under state statutes of limitations to four years for most transfers and obligations and one year for preferential transfers to insiders." It was the variance in the number of years each state allowed for a claimant to bring a fraudulent conveyance action which the UFTA sought to address and remedy.
....
To rule otherwise would be to rule in complete derogation of the UFTA itself. The UFTA, as we have said, discourages fraud. If the statute were to begin to run when the transfer was made, without regard as *598 to whether the claimant discovered or could have discovered the fraudulent nature of the transfer, those successful at concealing a fraudulent transfer would be rewarded. In this case, for instance, nothing on the instrument itself indicated a fraudulent transfer. The title report gives no indication of fraud. This transfer was to an insider, a family member, but the names were not the same and there was no indication of this relationship. The statute should not reward a person for successful concealment of fraud.
Id. , 947 P.2d 1186, 1188-90 (Wash. 1997) (en banc) (emphasis added) (citations omitted).
¶ 18 A district court sounded the same theme when construing identical language in Pennsylvania's statute, holding that a discovery-of-the-transfer rule would be "contrary to the statutory purpose" and would reward "those responsible for the concealing the fraudulent transfers":
To hold otherwise would in essence be a complete derogation of the UFTA itself. The obvious goal of UFTA is to discourage fraud.... [I]f the statute of limitations was to begin to run ... without regard as to whether the claimant discovered or could have discovered the fraudulent nature of the transfer , those responsible for the concealing the fraudulent transfers would be rewarded.
Cordua , 834 F.Supp.2d at 307 (emphasis added) (citation omitted).
¶ 19 In re Archdiocese of Milwaukee , 483 B.R. 855 (Bankr. E.D. Wis. 2012), is also instructive even if it is not binding on this court. In that case the United States Bankruptcy Court for the Eastern District of Wisconsin was faced with the same question presented here. At issue was an allegedly fraudulent transfer that occurred six years prior to the bankruptcy.
*599 Id. at 863. The creditors' committee in that case argued that a creditor could not reasonably have discovered the transfer, and the Archdiocese argued otherwise. In addressing what it took to trigger the discovery period, the court quoted a decision by the Seventh Circuit Court of Appeals holding that under the discovery rule, the statute of limitations does not start to run until a claimant knows that there is "something 'fishy' about the transfer[.]" Id. at 864-65 (citing Fidelity Nat'l Title Ins. Co. v. Howard Sav. Bank , 436 F.3d 836, 840 (7th Cir. 2006) ).
¶ 20 We therefore conclude that the correct interpretation of the statute is that it sets a one-year statute of limitations from the point at which the claimant discovers or reasonably could have discovered the fraudulent nature of the transfer or obligation. This reading is compelled by the plain language of the statute. Our inquiry can stop there because the statute "manifests a clear meaning" and "has a plain and reasonable meaning on its face."
*366 See Engler , 80 Wis.2d at 406, 259 N.W.2d 97. However, our plain language analysis is strongly supported by the obvious purpose of the statute, which would be thwarted by an interpretation that rewarded the successful concealment of fraud; and the legislature's explicit directive in WIS. STAT. § 242.11 that the state's version of the Uniform Fraudulent Transfer Act be construed to accomplish uniformity among states that have adopted it.
*600 II. The Individual Sellers failed to produce evidence that each creditor reasonably could have discovered the fraudulent nature of the transactions by April 2, 2011, such that the statute would have run on all claims by the time of the bankruptcy petition filing.
Summary judgment methodology.
¶ 21 WISCONSIN STAT. § 802.08 governs summary judgment methodology, and we apply that methodology in the same manner as the trial court. See Green Spring Farms v. Kersten , 136 Wis.2d 304, 315, 401 N.W.2d 816 (1987).
¶ 22 The summary judgment statute provides, in pertinent part, as follows:
The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
WIS. STAT. § 802.08(2). In applying this statute, we must do the following:
(1) examine the pleadings to determine whether the complaint states a claim and an issue of material fact, (2) examine the moving party's affidavits and other proof to determine whether the moving party has made out a prima facie case for summary judgment, and, (3) examine the non-moving party's affidavits and other proof to determine whether there is a dispute over a material fact from which alternative reasonable inferences could be drawn.
*601 Weigel v. Grimmett , 173 Wis.2d 263, 267, 496 N.W.2d 206 (Ct. App. 1992).
¶ 23 "The burden is on the moving party to prove that there are no genuine issues of material fact." Central Corp. v. Research Prods. Corp. , 2004 WI 76, ¶ 19, 272 Wis.2d 561, 681 N.W.2d 178. "An issue of fact is genuine if a reasonable jury could find for the nonmoving party." Id. If there is any reasonable doubt regarding whether there exists a genuine issue of material fact, that doubt must be resolved in favor of the nonmoving party. Schmidt v. Northern States Power Co. , 2007 WI 136, ¶ 24, 305 Wis.2d 538, 742 N.W.2d 294.
¶ 24 In examining the pleadings in a summary judgment motion, we look to the supporting papers of both parties. See WIS. STAT. § 802.08(3). The adverse party "must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against such party." Id. If, upon examining the pleadings, we find that "no proper claim has been stated, the inquiry ends, and the motion must be denied." See Miller Brands-Milwaukee, Inc. v. Case , 162 Wis.2d 684, 694, 470 N.W.2d 290 (1991).
¶ 25 We will reverse a decision granting summary judgment if either (1) the trial court incorrectly decided legal issues, or (2) material facts are in dispute. Coopman v. State Farm Fire & Cas. Co. , 179 Wis.2d 548, 555, 508 N.W.2d 610 (Ct. App. 1993). In our review, we, like the trial court, are prohibited from deciding issues *367 of fact; our inquiry is limited to a *602 determination of whether a factual issue exists. Id. "Evidentiary matters in affidavits accompanying a motion for summary judgment are deemed uncontroverted when competing evidentiary facts are not set forth in counteraffidavits." Wisconsin Elec. Power Co. v. California Union Ins. Co ., 142 Wis.2d 673, 684, 419 N.W.2d 255 (Ct. App. 1987).
The role of bankruptcy law in this case.
¶ 26 We add that the existence of applicable bankruptcy law in this case, on which the parties agree, affects the summary judgment analysis in two ways.
¶ 27 First, bankruptcy law provides that the Committee has standing to pursue the claims of the creditors if it can show that any creditor has a valid claim. Thus, if there is a so-called "triggering creditor," the Committee stands in the shoes of that creditor and cannot be barred from pursuing the fraudulent transfer claim on behalf of the estate. See 11 U.S.C. § 544(b), In re Leonard , 125 F.3d at 544 ("[I]f any unsecured creditor could reach an asset of the debtor outside bankruptcy, the Trustee [in this case, the Committee] can use § 544(b) to obtain that asset for the estate."), and Wieboldt Stores, Inc. , 94 B.R. at 506 (stating rule that a fraudulent transfer claim may proceed "if there is at least one creditor at the time who has standing under state law to challenge the transfer").
¶ 28 Second, because this case arises in the context of a bankruptcy, the focus is on determining what, if any, creditors' state law claims were in existence on the day of the filing of the bankruptcy petition (April 2, 2012). Thus, the sole relevant question is whether the statute of limitations had already run on *603 the creditors' potential state law fraudulent transfer claim by the date the petition was filed. That brings us back to WIS. STAT. § 893.425 and the rule that a creditor's claim expires, at the latest, a year after the creditor "reasonably could have discovered" the fraudulent transfer. It follows that any claim that could reasonably have been discovered a year prior to the bankruptcy filing (i.e., April 2, 2011) would have expired by the date of the bankruptcy filing.
The summary judgment pleadings.
¶ 29 The Individual Sellers brought the motion for summary judgment, arguing that the operative statute of limitations was triggered and expired before the bankruptcy was filed. They argued that they were entitled to judgment as a matter of law because "the issuance of the notes was reasonably discoverable prior to April 2, 2011." They gave the following evidence in support of that proposition. First, that Valvoline Instant Oil Change, one of the debtor's creditors, had been given "express notice of the sale terms and all financial aspects of the sale, including the Notes" and approved the sale in advance. Second, that leasehold mortgages executed for forty-seven stores and recorded in 2004 contained a list of the mortgagor's debts that included the three "Seller Note[s]" and the amount of each. Third, projected financials that were given in September 2004 to third-party investors showed, under a heading of "Indebtedness," an entry for "Vendor Note" in the amount of three million dollars. Fourth, a press release posted around May 2008 on the website of the investment firm that negotiated terms of the sale describes the transaction as involving a "vendor take-back note." Fifth, beginning in November 2004, *604 audited balance sheets listed "Notes Payable-GLL" in the Long-Term Liabilities section; "many creditors had contractual rights" to demand the financials, and "[v]arious lender creditors also had that right." The Individual Sellers argued that "all of the above evidence existed and was available for any *368 reasonably diligent creditor to discover and/or inquire about." They argued that "[c]ollectively, the evidence overwhelmingly demonstrates that there was no effort to conceal these Notes by Defendants or the Chapter 11 Debtor."
¶ 30 The pleading from the movants, the Individual Sellers, sets forth a prima facie case for summary judgment because it provided evidentiary facts that would, if uncontradicted, resolve the factual issue here in the movants' favor-but only if the statute is construed to state a discovery-of-the-transfer rule. See Walter Kassuba, Inc. v. Bauch , 38 Wis.2d 648, 655, 158 N.W.2d 387 (1968). That is because the movants' pleading focuses on the fact of the transfer (the issuance of the notes) and the ability of creditors to obtain knowledge that the notes were issued in 2004 and paid in 2009. As we have explained above, however, the statute is not triggered until a claimant could reasonably discover the circumstances and nature of the transfer (such as details of the financial status of the debtor, the identity of the entity to whom the notes were issued, and whether they were given in exchange for loans), and the movants did not demonstrate that all creditors had this necessary piece of the picture or access to it.
¶ 31 In its responsive pleading, the Committee argued that even if some creditors knew of the existence of the notes, that knowledge was not sufficient to create a reasonable suspicion of fraud. There was *605 evidence that the debtor had concealed from creditors its financial condition as well as the existence and nature of the notes. There was at least one creditor who averred that its contractual rights did not give it access to the debtor's financial statements. The Committee submitted affidavits from six unsecured creditors, any one of which, it argued, had on the relevant date a valid state claim on which the statute had not run:
- The first creditor, Terry McGuire, was a principal in entities that leased properties, and he averred that he assigned the leases to the debtor based on representations by one of the Individual Sellers and information that the debtor was solvent. He averred that he never knew of the debtor's promissory notes to the Individual Sellers until after the bankruptcy filing in 2012.
- The second creditor, Jay and Rowena Impson, had purchased a quick lube store in Racine and leased it to the debtor. Jay Impson averred that prior to the bankruptcy filing he had no knowledge of the terms of the 2004 sale or that it was financed with three million dollars in notes to the Individual Sellers. He averred that the "Pro Forma Balance Sheet" for Great Lakes Quick Lube LP that he received prior to purchasing the store in 2005, contained a line item for "Vendor Note" and that he would have interpreted that line item as "an obligation to one of the company's vendors for goods."
- The third creditor, Parvathi Venkat, is a member of PVMR Investment Properties, LLC (PVMR), which purchased a store in 2005 and leased to the debtor. He averred that he was provided a "Pro Forma Balance Sheet" for the debtor listing a "Vendor Note" and believed that it was "to a trade vendor or *606 supplier of the Debtor, such as oil, and not former owners of the operations." In 2009, the debtor sought a reduction in rent, told PVMR that it was due to increased tax assessments, and provided copies of financial statements for the two prior years. Those statements showed notes for three million dollars that were payable in November 2009 but gave no further information *369 about them. Venkat averred that he had no knowledge of the nature of the notes prior to the bankruptcy case.
- The fourth creditor, Lowell McGrane, purchased a store and leased it to the debtor. He averred that he did not regularly receive financial statements from the debtor. He averred that the debtor blamed the economic downturn when it requested extensions for making rental payments and that he believed this. He also averred that prior to the bankruptcy filing he had no knowledge about the notes issued to the Individual Sellers.
- The fifth creditor, Katherine Retelas, averred that she took notes while reviewing documents related to her purchase of a store in 2005. She averred that when she saw the promissory notes listed, she believed that the debtor had received actual funds in exchange for the notes. She averred that she had no knowledge until the bankruptcy filing of the circumstances of the notes or that they were issued to the debtor's former owners.
- The sixth creditor, Joe Zidanic, was the controller for the Milwaukee Brewers during the relevant period, and he averred that the debtor had failed to make payments for sponsorship agreements in the amount of approximately $300,000. He averred that the information made available to him was a credit report that did not include financial statements. He averred that the Brewers never received any financial *607 information from the debtor prior to the bankruptcy filing. He averred that the Brewers had no knowledge of the notes until the bankruptcy.
¶ 32 The Committee argued that because "[d]ifferent creditors had different sources of piecemeal information about the Debtor," what could reasonably be discovered varies as to each individual creditor. It argued that applying the correct interpretation of the discovery rule-the discovery-of-the-fraud approach-means that even a showing that a creditor could reasonably have discovered the existence of the notes is not sufficient and that each of the six creditors who provided an affidavit could not reasonably have discovered the fraudulent nature of the issuance of the notes.
¶ 33 The Committee specifically argued that McGuire received no financial information related to the purchase of his properties as others did who purchased their properties after the 2004 transaction. It argued that the Brewers "had no reason to know about the notes or payments, and no access to information which would have revealed them." As to the remaining creditors, it argued that while each may have had access to documents listing "Vendor Notes" or "Notes Payable-GLL," none had any indication that something was "fishy."
The movants must show that there is no creditor with a valid claim as of April 2, 2012.
¶ 34 The limited question is whether any unsecured creditor had a valid state law claim on April 2, 2012. As explained above, it is well established in bankruptcy law that if any creditor had a valid state law claim at that point, the Committee is authorized to pursue claims for all creditors. The Individual Sellers *608 acknowledge this standard in their reply brief to the trial court, which states, "Plaintiff does not get to hide behind a bankruptcy rule that simply provides that if a claim can validly be pursued by one creditor it can be pursued by the committee."
¶ 35 Applying the relevant bankruptcy and state law, then, what is required of the *370 Individual Sellers who are seeking summary judgment on the grounds that the Committee's claim is time barred? As the moving party, the Individual Sellers have the burden to show, as to each of the "triggering creditors ," that not one had a timely state law claim at the time of the bankruptcy petition filing. Analyzing the motion for summary judgment requires applying both the fraudulent transfer statute and the relevant bankruptcy law to determine whether that each creditor "could reasonably have discovered" the fraudulent nature of the transfer prior to April 2, 2011, which would mean that each creditor's claim would have expired prior to the date of the bankruptcy filing. If that is true as to each creditor, then no creditor's state claim was in existence on April 2, 2012, and the Committee, whose standing is contingent on the existence of at least one unsecured creditor with a valid claim, is procedurally unable to pursue a claim. Conversely, to survive summary judgment, the Committee needs only show that one unsecured creditor had a valid, unexpired claim on April 2, 2012.
¶ 36 The analysis thus requires not a review of what information was available to various groups of people, but a focus on what the alleged "triggering creditors" "could reasonably have discovered" by April 2, 2011.[6] If there is one that could not reasonably have *609 discovered the fraudulent nature of the transfer by that time, it follows that its claim would not be extinguished on April 2, 2012. If that is the case, the analysis ends and summary judgment must be denied.
¶ 37 Rather than conducting such an analysis, however, the trial court focused on the various ways in which the fact of the transfer was disclosed to certain creditors and concluded that "[a] reasonable creditor exercising its duty to reasonably inquire would have discovered these notes." The trial court cited specifically the leasehold mortgages that were disclosed to some of the debtor's landlords and the projected financials that were shared with some of the debtor's creditors. It listed the ways that the notes had been referenced, such as in legal documents and on a website of the broker who had handled the leveraged buyout for the debtor. It conducted no analysis of how each of the potential triggering creditors presented by the Committee could reasonably have discovered the fraudulent nature of the transfer. Indeed, as noted above, some creditors averred that they had no access to documents referencing the notes, and others averred that even if they had access to the documents, they had no reason to suspect, until the filing of the bankruptcy petition, that the notes were made with fraudulent intent.
¶ 38 The question is whether every individual triggering creditor who provided an affidavit "reasonably could have discovered" the fraudulent nature of the 2004 transfer by April 2, 2011 such that all state law claims had expired by April 2, 2012 and the *610 Committee is therefore deprived of standing to bring any claims. In order to prevail, the Individual Sellers must show that each triggering creditor could reasonably have discovered the fraudulent nature of the promissory notes by that date and failed to do so. As the moving party, they have the burden to prove that there are no genuine issues of material fact. See Central Corp. , 272 Wis.2d 561, ¶ 19, 681 N.W.2d 178. The *371 Individual Sellers instead provided a list of documents referencing the promissory notes, such as leasehold mortgages and projected financials, which were given to certain creditors. They have at best shown that the transfers were not concealed, but they have not shown that each of the individual triggering creditors could reasonably have accessed the documents that disclosed the notes. Further, they have not shown how, even if a creditor had discovered the existence of the notes, he or she would have known the nature of the notes or would have had reason to investigate further.
¶ 39 Because the Individual Sellers have failed to satisfy their burden to show that no creditor had a valid claim under WIS. STAT. § 242.04, the Individual Sellers are not entitled to summary judgment. Under bankruptcy law, the existence of a single, "triggering creditor" with a timely state law claim gives standing to the Committee to pursue claims. In this case, creditors' § 242.04 claims are time barred only if they could reasonably have discovered the fraudulent nature of the transfer prior to April 2, 2011. The Individual Sellers have not shown that this is true as to each creditor-in other words, that every creditor could reasonably have discovered the nature of the transfer by that time and every creditor's claim has expired.
*611 ¶ 40 We therefore reverse and remand for further proceedings.
By the Court. -Order reversed and cause remanded for further proceedings.

Wisconsin Stat. § 242.07(1)(a) creates remedies for defrauded creditors, including "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." Wisconsin Stat. § 242.04, titled "Transfers fraudulent as to present and future creditors," defines fraudulent transfers as follows:
(1) A transfer made or obligations incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(a) With actual intent to hinder, delay or defraud any creditor of the debtor; or
(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
2. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.
All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The parties stipulate that if every creditor represented by the Committee could reasonably have discovered the transfer prior to April 2, 2011, the Committee's fraudulent transfer claim would have expired by the time the bankruptcy petition was filed on April 2, 2012. The bankruptcy court allows creditors to pursue only those state law claims that existed as of the date of the bankruptcy petition's filing.

The Committee argues that "[t]he Debtor did not receive reasonably equivalent value in exchange for the notes" and that there were "multiple 'badges of fraud' " associated with the issuance of the notes. The Individual Sellers argue that the promissory notes along with a cash payment of $23.6 million constituted the purchase price for the sale and that no part of the transaction was concealed. These arguments go to the merits of the claim and are not relevant to this appeal. We reach no conclusion as to whether this particular transaction was fraudulent under the statute. Our analysis concerns solely the question of whether the movants met their burden when they moved for summary judgment on the grounds that the action is time-barred.

The following brief summary of current bankruptcy and fraudulent transfer law describes how bankruptcy law permits unsecured creditors who can prove a fraudulent transfer to recover funds that were paid to sellers as part of a leveraged buyout. As the article explains, "if shortly before bankruptcy a debtor in financial distress gives away assets and does not get reasonable value in return, creditors can have that transaction avoided by the bankruptcy court." Laura Femino, Ex Ante Review of Leveraged Buyouts , 123 Yale L.J. 1830, 1835 (2014). The typical scenario involves the unsecured creditors of a highly leveraged company:
[A leveraged buyout (LBO) ] is the acquisition of a target company financed by debt that is secured by the assets of the target company and paid with the target's future cash flows.... The acquirer then uses these funds to buy the target from the target's current shareholders, often at a large premium, and the acquirer becomes the new owner.
The transaction leaves the target with a highly leveraged (or debt-heavy) capital structure, often close to a ninety percent debt-to-equity ratio.... The transaction, then, may be harmful to the existing, unsecured creditors of the target, who gained nothing from the transaction but saw the value of their debt decrease as the risk associated with that debt increased.
The existing creditors face a real loss if the LBO is a failure and the highly leveraged target does in fact go into bankruptcy. In that case, the former shareholders lose nothing-they have already sold their interest in the company. But the unsecured creditors have to stand in line behind the secured lender in order to get their money. Since the lender has a lien on all of the target's assets, there will be few (if any) unsecured assets left for the unsecured creditors to share.
The transaction looks a lot worse if the target was close to bankruptcy at the time of the LBO.... The failed LBO ... allows the shareholders to cash out in full-at a premium, no less-at the time of the acquisition, while the creditors get paid-if they get paid at all-months after the acquisition when the company finally enters bankruptcy.
Certain provisions of the Bankruptcy Code protect creditors against just such a transaction. [Fraudulent transfer law (FTL) ] provides that if shortly before bankruptcy a debtor in financial distress gives away assets and does not get reasonable value in return, creditors can have that transaction avoided by the bankruptcy court.
...
... FTL is codified in the Bankruptcy Code and in various state statutes, many of which incorporate the language of the Uniform Fraudulent Transfer Act....
... In the case of an LBO, § 550 [of the Bankruptcy Code] can sometimes be used to recover funds transferred to the target's selling shareholders .
Id. , 1834-39 (emphasis added). In a well-known LBO fraudulent transfer case, unsecured creditors successfully challenged multiple transfers by which the seven shareholders received $6.7 million while the company and its subsidiaries were insolvent and headed for bankruptcy. The district court stated:
The Raymond Group was insolvent [on the date of the transaction]. In addition, no plausible argument has been made or indeed could be made that the Raymond Group received fair consideration for the transfer of its assets to the [shareholders].... [T]hose ... loan proceeds which were funnelled out of the Raymond Group ... constituted a fraudulent conveyance under § 354 of the Act.
United States v. Gleneagles Inv. Co. , 565 F.Supp. 556, 585 (M.D. Pa. 1983), aff'd sub nom. United States v. Tabor Court Realty Corp. , 803 F.2d 1288 (3d Cir. 1986).

See Janvey v. Democratic Senatorial Campaign Comm., Inc. , 712 F.3d 185, 195 (5th Cir. 2013) ; Bash v. Textron Fin. Corp. (In re Fair Fin. Co. ), 834 F.3d 651, 673 (6th Cir. 2016) ; Fidelity Nat'l Title Ins. Co. v. Howard Sav. Bank , 436 F.3d 836, 840 (7th Cir. 2006) ; IBT Int'l Admin. Servs., Inc. v. Northern (In re Int'l Admin. Servs. ), 408 F.3d 689, 709 (11th Cir. 2005) ; Freitag v. McGhie , 133 Wash.2d 816, 947 P.2d 1186, 1190 (1997) (en banc); Duran v. Henderson , 71 S.W.3d 833, 839 (Tex. Ct. App. 2002) ; Rappleye v. Rappleye , 99 P.3d 348, 356 (Utah Ct. App. 2004) ; Belfance v. Bushey (In re Bushey ), 210 B.R. 95, 99 n.5 (6th Cir. BAP 1997) (stating that Ohio applies a discovery-of-the-fraud rule in its UFTA statute of limitations); Schmidt v. HSC, Inc. , 131 Hawai'i 497, 319 P.3d 416, 427 (2014) ; Ezra v. Seror (In re Ezra ), 537 B.R. 924, 934 (9th Cir. BAP 2015) (anticipating that California courts would apply the discovery-of-the-fraud rule).

Contrary to the Individual Sellers' argument, this does not transform the test into a subjective rather than objective one. The "could reasonably have discovered" language is an objective standard that is applied to each individual creditor . If it were a subjective test, the question would be whether each individual creditor actually did discover it.