COURT OF APPEALS
DECISION
DATED AND FILED

April 8, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2135**

STATE OF WISCONSIN

Cir. Ct. No. 2023CV271

IN COURT OF APPEALS
DISTRICT III

---

SETH E. DIZARD, RECEIVER OF RIDGEWAY TRAILER COMPANY,

PLAINTIFF-APPELLANT,

V.

TORRO LLC,

DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Brown County: THOMAS J. WALSH, Judge. *Reversed and cause remanded.*

Before Stark, P.J., Hruz and Gill, JJ.

¶1 GILL, J. This case concerns the enforceability of choice of law and forum selection provisions—providing for the application of Utah law before a Utah court—contained in contracts between an alleged insolvent debtor and a creditor when a Wisconsin receiver seeks to recover preferential payments made

to the creditor from the debtor as governed by WIS. STAT. § 128.07 (2023-24).[1] The question on appeal is whether the public policy in Wisconsin of favoring the equal distribution of assets when creditors cannot be paid, which is "embedded in … § 128.07," *see Freund v. Nasonville Dairy, Inc.*, 2019 WI App 55, ¶25, 389 Wis. 2d 35, 934 N.W.2d 913, is so "important" as to render the choice of law and forum selection provisions in the parties' contracts unenforceable, *see American Fam. Mut. Ins. Co. v. Cintas Corp. No. 2*, 2018 WI 81, ¶13, 383 Wis. 2d 63, 914 N.W.2d 76.

¶2　　We conclude that Wisconsin's public policy favoring the equal distribution of assets when creditors cannot be fully paid—to the point of allowing a receiver to recover preferential payments—"embodies a public policy so important that [the] parties may not avoid it." *See Cintas Corp.*, 383 Wis. 2d 63, ¶14. In reaching this conclusion, we are cognizant of the presumption of enforceability of forum selection provisions. *See Beilfuss v. Huffy Corp.*, 2004 WI App 118, ¶17, 274 Wis. 2d 500, 685 N.W.2d 373. We are also cognizant that parties have the freedom of contract and, as part of that principle, individuals should have the power to govern their own affairs without governmental interference. *See Rosecky v. Schissel*, 2013 WI 66, ¶56, 349 Wis. 2d 84, 833 N.W.2d 634.

¶3　　The contracts in this case, however, were between a debtor and a creditor. The receiver, as well as the debtor's remaining creditors, were not privy to the contract negotiations. WISCONSIN STAT. § 128.07 "protect[s] a weaker

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

party against the unfair exercise of superior bargaining power by another party" because it permits a receiver, under certain conditions, to recover preferential payments made while a debtor is insolvent. *See Cintas Corp.*, 383 Wis. 2d 63, ¶14 (citation omitted). Stated differently, § 128.07 effectively prevents a well-placed creditor from obtaining an insolvent debtor's assets at the expense of other creditors who did not have a choice in the matter. Moreover, Utah law does not afford the same protections to creditors and receivers as Wisconsin law does under § 128.07, and Wisconsin law would apply absent the choice of law provisions. *See Coady v. Cross Country Bank*, 2007 WI App 26, ¶17, 299 Wis. 2d 420, 729 N.W.2d 732.

¶4     Accordingly, we conclude that the choice of law and forum selection provisions at issue in this case are unenforceable. We therefore reverse the circuit court's order dismissing the present action after it concluded that the choice of law and forum selection provisions were enforceable, and we remand for further proceedings.

## BACKGROUND

¶5     Ridgeway Trailer Company was in the business of selling, renting, and brokering the purchase and sale of truck trailers and truck parts. In April 2020, Ridgeway filed for receivership in Brown County case No. 2020CV435, pursuant to WIS. STAT. ch. 128. Thereafter, Seth Dizard (the "Receiver") was appointed as the receiver of Ridgeway. *See* WIS. STAT. § 128.08.

¶6     Prior to filing for receivership, Ridgeway had entered into two merchant cash advance (MCA) contracts with Torro LLC. On July 24, 2019, Ridgeway and Torro entered into an MCA contract, whereby Torro purchased

$372,500 of Ridgeway's future accounts receivable for $250,000, less all applicable fees. The first MCA contract provides:

> **Governing Law, Venue, and Jurisdiction.** This Agreement shall be governed by and construed exclusively *in accordance with the laws of the State of Utah*, without regards to any applicable principles of conflicts of laws. If there is any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, then such litigation *shall only be instituted in any court sitting in Utah State* (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. Should a proceeding be initiated in any other forum, the parties waive any right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum.

(Emphasis added.) On February 18, 2020, Ridgeway and Torro entered into another MCA contract, whereby Torro purchased $596,000 of Ridgeway's future accounts receivable for $400,000, less applicable fees. The second MCA contract contains virtually identical language to the first contract. In addition, it provides:

> Seller and its Guarantor(s) acknowledge and agree that the Purchase Price is being paid and received by Seller in Utah, that the Specified Percentage of the Future Receipts are being delivered to [Torro] in Utah, and that the transaction contemplated in this Agreement was negotiated, and is being carried out, in Utah. Seller and Guarantor(s) acknowledge and agree that Utah has a reasonable relationship to this transaction.

¶7 According to the Receiver's summons and complaint, historically, "MCA companies advance cash [in] exchange for a set percentage of a business's daily credit card and debit card receipts." MCA companies also "often make advances to their customers against future accounts receivable." When this form of transaction occurs, the MCA companies "'buy' a specified amount of future accounts receivable at a deep discount and begin automatically deducting

4

payments from [a] customer's bank account on a daily or weekly basis until the full face value of the purchased accounts receivable has been collected." Within the four-month period preceding Ridgeway's filing for receivership, Ridgeway made payments to Torro, pursuant to the MCA contracts, totaling $137,180.

¶8      The Receiver filed the present action in the Brown County Circuit Court against Torro. He alleged that the $137,180 in payments made within the four-month period preceding Ridgeway's filing for receivership were preferential transfers, and, thus, the Receiver was permitted, under WIS. STAT. § 128.07, to recover the payments.

¶9      Torro filed a motion to transfer venue, citing the two MCA contracts and the forum selection provisions contained therein. Torro asserted that the forum selection provisions required "the Receiver's legal action to be instituted in a state court in Utah." Torro's motion to transfer venue requested that the circuit court either transfer the action to "a state court in Salt Lake County, Utah" or, alternatively, dismiss the action so that the Receiver "can refile it in a Utah state court."

¶10      The Receiver opposed Torro's motion to transfer venue, asserting that because the MCA contracts contain choice of law and forum selection provisions, the circuit court was required to first examine whether the choice of law provisions were enforceable. *See Beilfuss*, 274 Wis. 2d 500, ¶¶13, 16-18. The Receiver cited ***Bush v. National School Studios, Inc.***, 139 Wis. 2d 635, 643 n.1, 407 N.W.2d 883 (1987), for the proposition that the choice of law provisions in the MCA contracts were unenforceable. In ***Bush***, our state supreme court cited a law review article compiling a "survey of decisions" in which "courts have found" that certain laws "embody public policies which warrant overriding … [a]

5

contractual choice of law clause." Those laws included: prohibitions of covenants not to compete; unconscionability doctrines; statutes of frauds; fair dealership laws; and "state bankruptcy laws." *Id.* (quoting Richard J. Bauerfeld, *Effectiveness of Choice-of-Law Clauses in Contract Conflicts of Law: Party Autonomy or Objective Determination?*, 82 COLUM. L. REV. 1659, 1672-73 (1982)). The Receiver argued that WIS. STAT. ch. 128 "is part of Wisconsin's 'bankruptcy laws.'" Furthermore, the Receiver stated that Wisconsin law would apply absent the choice of law provisions.

¶11 The Receiver also asserted that "Wisconsin's strong public policy interest in applying its own receivership/bankruptcy laws is particularly relevant" to this case, where there "are more than 50 creditors …, many of whom are based in Wisconsin." The Receiver stated that "[i]t is contrary to important Wisconsin public policy to force those Wisconsin creditors (and the Wisconsin receiver) not only to go litigate those rights in Utah, but to have those rights litigated in accordance with *Utah law*." According to the Receiver, because the choice of law provisions are contrary to Wisconsin public policy, the forum selection clauses also failed.[2]

¶12 In reply, Torro argued that WIS. STAT. ch. 128 is not a state bankruptcy law as that term was used in *Bush*, that forum selection clauses are afforded a presumption of enforceability, and that Utah law would apply absent the choice of law provisions.

---

[2] The Receiver also argued that the forum selection clauses did not apply to the type of claim the Receiver brought. The Receiver has abandoned this argument on appeal, and we will not consider that issue further. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998).

¶13 The circuit court issued a decision and order granting Torro's motion. The court first determined that **Bush** did not require the court to find that the choice of law provisions were unenforceable, as applied to the Receiver's claim, because WIS. STAT. ch. 128 "establishes the receivership regime in the [S]tate of Wisconsin. It is not a bankruptcy law, in fact, it operates as an alternative to bankruptcy." The court further held that the Receiver had "failed to show that enforcement of the choice of law provision[s] or the forum selection provision[s] … would be contrary to an overriding public policy concern." The court issued a final order dismissing the action without prejudice. This appeal follows.

## DISCUSSION

¶14 Both MCA contracts at issue include a choice of law provision and a forum selection provision. A choice of law provision is generally enforceable so long as it does not contradict an "important" public policy "of a state whose law would be applicable if the" provision were disregarded. **Bush**, 139 Wis. 2d at 642. A forum selection provision is presumptively enforceable "unless the contract provision is substantively unreasonable," which can occur if the provision violates a "strong public policy of the forum in which the suit is actually brought." **Beilfuss**, 274 Wis. 2d 500, ¶17 (citation omitted).

¶15 In **Beilfuss**, this court held that when a contract includes both a choice of law provision and a forum selection provision, "the validity of the choice of law provision is a precondition to determining the enforceability of the forum selection provision." **Id.**, ¶13. If a choice of law provision is valid, we next examine the contract's forum selection provision. **Id.** However, if the choice of law provision is invalid due to an important public policy, **Beilfuss** dictates that

"the enforcement of the forum selection provision would be unreasonable" because it too would violate an important public policy. *See id.*, ¶¶16-18.

¶16     The Receiver does not argue that the forum selection provisions are unenforceable if the choice of law provisions are enforceable. We therefore focus our analysis on the choice of law provisions. Whether a choice of law provision is enforceable requires interpretation of the contract at issue. *Id.*, ¶6. Interpretation of a contract is a question of law which we review de novo. *Id.*

## I. Choice of law principles

¶17     "There is no doubt that, generally speaking, parties are free to choose the law governing their contracts." *Id.*, ¶13; *see also Thurner Heat Treating Co. v. Memco, Inc.*, 252 Wis. 16, 24, 30 N.W.2d 228 (1947) ("It is the policy of the law not only to encourage the embodiment of specific and material provisions in a contract, but in the interest of certainty and fair dealing, to require a plain and fair statement of terms."). "Wisconsin courts have long recognized the importance of freedom of contract and have endeavored to protect the right to contract." *Rosecky*, 349 Wis. 2d 84, ¶56 (citation omitted). "A founding principle of freedom of contract is that 'individuals should have the power to govern their own affairs without governmental interference.'" *Id.* (citation omitted).

¶18     However, parties "may not use their freedom to escape '*important public policies of a state whose law would be applicable if the parties['] choice of law provision were disregarded.'" *Cintas Corp.*, 383 Wis. 2d 63, ¶13 (alteration in original; emphasis added; citation omitted). Thus, Wisconsin's "important public policy considerations would trump a choice of law provision selecting a foreign jurisdiction's law as controlling." *Beilfuss*, 274 Wis. 2d 500, ¶13.

¶19 "A precise delineation of those policies which are sufficiently important to warrant overriding a contractual choice of law stipulation is not possible." *Bush*, 139 Wis. 2d at 643. That said, our state supreme court has "at least described some of the characteristics by which we might recognize them." *Cintas Corp.*, 383 Wis. 2d 63, ¶14. "They are policies that 'make a particular type of contract enforceable,' or that 'make a particular contract provision unenforceable,' or that 'protect a weaker party against the unfair exercise of superior bargaining power by another party.'" *Id.* (quoting *Bush*, 139 Wis. 2d at 643). "Courts (not necessarily ours) have seen those characteristics in, for example, usury laws, unconscionability doctrines, fair dealership laws, prohibitions on covenants not to compete, and statutes of frauds." *Id.*

¶20 When analyzing the enforceability of a choice of law provision, it is important to keep in mind that "every state law embodies a public policy," and it is in the very nature of choice of law provisions "that they substitute one state's policies for another." *Id.*, ¶17. "[I]t is only when such clauses obviate an '*important* public policy' that we set them aside." *Id.* Further, "[b]ecause spotting the 'important' public policies amongst all the rest is an inexact endeavor, we do well to keep that category narrowly focused." *Id.*, ¶16. "If it were to expand beyond its essential kernel, certainty and predictability in contractual relations would erode in like measure because parties would find it increasingly difficult to know which provisions or contracts a court might preempt." *Id.*

¶21 Four Wisconsin cases serve as the foundation for analyzing the enforceability of the choice of law provisions in this case. First, in *Bush*, the plaintiff commenced an action against his former employer claiming that he was wrongfully terminated in violation of the Wisconsin Fair Dealership Law (WFDL). *Bush*, 139 Wis. 2d at 636-37; *see also* WIS. STAT. ch. 135. Prior to his

termination, the plaintiff worked as a photographer in northern Wisconsin for a Minnesota corporation pursuant to an employment contract, which contained a choice of law provision stating that the contract was governed by Minnesota law. **Bush**, 139 Wis. 2d at 637-39. The circuit court ultimately determined that Wisconsin law—the WFDL—not Minnesota law, applied, and a jury found that the employer was liable to the plaintiff. **Id.** at 641.

¶22 On appeal, our state supreme court concluded that the choice of law provision was unenforceable because it conflicted with "a strong public policy" embodied in the WFDL. **Id.** at 637. In reaching this conclusion, the court noted that the Wisconsin legislature specifically stated, in WIS. STAT. § 135.025, that the WFDL was enacted "[t]o protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships." **Bush**, 139 Wis. 2d at 644 (alteration in original; quoting § 135.025(2)(b)). The court further looked to § 135.025(3), which states that the effect of the WFDL "may not be varied by contract or agreement" and that "[a]ny contract or agreement purporting to do so is void and unenforceable to that extent." **Bush**, 139 Wis. 2d at 644-45 (alteration in original; quoting § 135.025(3)). Moreover, the court considered the fact that the WFDL and its Minnesota counterpart were "not co-extensive." **Bush**, 139 Wis. 2d at 641.

¶23 In **Coady**, a case that reached a similar conclusion, Cross Country Bank was sued by some of its credit card customers who alleged that Cross Country engaged in illegal debt collection practices in violation of the Wisconsin Consumer Act (WCA). **Coady**, 299 Wis. 2d 420, ¶1. Prior to the dispute, the customers and Cross Country entered into credit card agreements, which included choice of law provisions stating that Delaware law governed the contracts. **Id.**, ¶3. The agreements also included arbitration clauses, and those clauses contained

further choice of law provisions stating that federal law governed the arbitration. *Id.*, ¶4.

¶24 On appeal, Cross Country argued that the credit card agreements' choice of law provisions required the application of Delaware law to determine whether the arbitration clauses were unconscionable. *Id.*, ¶8. This court held that allowing individuals in Wisconsin to avail themselves of the WCA "embodies an important state public policy," which invalidated the choice of law provisions. *Id.*, ¶12. We determined that the WCA is similar to the WFDL in that it "is plainly designed to protect a weaker party against the unfair exercise of superior bargaining power by another party." *Id.* "The legislature has expressly stated that the purposes of the WCA include the protection of 'customers against unfair, deceptive, false, misleading and unconscionable practices by merchants' and the encouragement of 'the development of fair and economically sound consumer practices in consumer transactions.'" *Id.* (quoting WIS. STAT. § 421.102(2)(b), (c)). In reaching this conclusion, we applied a traditional choice of law analysis to reject the argument that "Delaware law would apply … even absent the choice of law clause." *Id.*, ¶¶13-17; *see also* ***Drinkwater v. American Fam. Mut. Ins. Co.***, 2006 WI 56, ¶¶40-42, 290 Wis. 2d 642, 714 N.W.2d 568.

¶25 In ***Beilfuss***, the plaintiff and his former employer had previously entered into an employment contract that included a choice of law provision and a forum selection provision requiring "any dispute to be resolved by the application of Ohio law in either state or federal Ohio courts." ***Beilfuss***, 274 Wis. 2d 500, ¶3. The contract also included restrictive covenants governing the use of confidential information and noncompetition. *Id.*, ¶2. The plaintiff was hired by a new employer and, thereafter, commenced a declaratory judgment action against his former employer for the restrictive covenants contained within his previous

11

employment contract to be deemed unenforceable under Wisconsin law. *Id.*, ¶¶2-3; *see also* WIS. STAT. § 103.465 (1995-96). After the plaintiff's former employer moved to dismiss based on the choice of law and forum selection provisions, the plaintiff argued that the enforcement of those provisions was against public policy. *Beilfuss*, 274 Wis. 2d 500, ¶4.

¶26 This court held that Wisconsin public policy rendered the choice of law provision unenforceable. *Id.*, ¶16. In reaching that conclusion, we considered the public policy concerns in WIS. STAT. § 103.465 (1995-96). We determined that the "public policy concerns with covenants not to compete can be found in the explicit purpose of … § 103.465 [(1995-96)], which is to invalidate covenants that impose unreasonable restraints on employees." *Beilfuss*, 274 Wis. 2d 500, ¶14 (citing *Heyde Cos. v. Dove Healthcare, LLC*, 2002 WI 131, ¶¶13, 22, 258 Wis. 2d 28, 654 N.W.2d 830 ("[T]he explicit purpose of § 103.465 [(1999-2000)], as plainly stated in the statute, is to invalidate covenants that impose unreasonable restraints on employees.")).

¶27 In addition, we considered it relevant to the choice of law analysis that Ohio law did not afford as much protection to employees as was guaranteed under WIS. STAT. § 103.465 (1995-96). *Beilfuss*, 274 Wis. 2d 500, ¶15. Specifically, § 103.465 (1995-96) provided that "[a]ny … restrictive covenant imposing an unreasonable restraint is illegal, void and unenforceable even as to so much of the covenant … as would be a reasonable restraint." *See also Beilfuss*, 274 Wis. 2d 500, ¶15. Conversely, "Ohio law permit[ted] selective enforcement or judicial modification of an unreasonable covenant not to compete so as to enforce the covenant deemed reasonable." *Id.* We further held that "because the choice of law provision [was] invalid, the enforcement of the forum selection provision would be unreasonable." *Id.*, ¶16.

12

¶28     Most recently, in ***Cintas Corp.***, Cintas was sued by those affected by a fire at a senior living facility. ***Cintas Corp.***, 383 Wis. 2d 63, ¶¶3-4. Cintas then tendered the defense of the matter to Becker Property Services, the property manager, because a contract between Cintas and Becker included an indemnity clause. ***Id.***, ¶¶3-5. The contract also included a choice of law provision stating that Ohio law governed the contract. ***Id.***, ¶6. After Becker rejected the tender, Cintas impleaded it as a third-party defendant, seeking indemnification. ***Id.***, ¶5. Becker filed a motion for summary judgment, arguing that the choice of law provision was unenforceable because it was against Wisconsin's "public policy" of strictly construing indemnification clauses. ***Id.***, ¶¶6, 12.

¶29     Our state supreme court held that Wisconsin's practice of strictly construing indemnification provisions did not embody a public policy so important that it would trump a choice of law provision because the strict construction rule contained none of the characteristics indicative of such a policy.[3] ***Id.***, ¶15. For example, the strict construction rule does not address the enforceability of a type of contract. ***Id.*** It applies without respect to the parties' relative bargaining power, and it functions "simply to ensure the parties actually intended for the indemnitee to be indemnified not just for the negligence of others for which it might be responsible, but for the indemnitee's own negligence as well." ***Id.*** The

---

[3] The court explained the rule of "strict construction of indemnification promises," stating, "In cases where the damage results solely from the negligence of the indemnitee, and the indemnitee seeks recovery from the indemnitor, this court and the overwhelming majority of other state courts apply the rule that the indemnity contracts will be strictly construed." ***American Fam. Mut. Ins. Co. v. Cintas Corp. No. 2***, 2018 WI 81, ¶12 n.6, 383 Wis. 2d 63, 914 N.W.2d 76 (citation omitted).

Becker further argued that enforcement of the choice of law provision was against Wisconsin's "public policy that indemnification provisions … must be conspicuous." ***Id.***, ¶17. The court did not address this argument because Becker did not sufficiently develop it. ***Id.***

court emphasized that the policy in question must be *important* to overcome the enforceability of a choice of law provision.[4]  *Id.*, ¶17.

## II.  Enforceability of the choice of law provisions in the MCA contracts

¶30  Before turning to the choice of law provisions in this case, we believe it is imperative to first identify the public policy underlying WIS. STAT. § 128.07, the provision limiting preferential transfers.  To do so, we provide an overview of WIS. STAT. ch. 128.

¶31  Created in 1937, WIS. STAT. ch. 128 "governs assignments for the benefit of creditors" and "provides a state law alternative to federal bankruptcy." *BNP Paribas v. Olsen's Mill, Inc.*, 2011 WI 61, ¶¶38-39, 335 Wis. 2d 427, 799 N.W.2d 792.  "It sets forth a statutory scheme under which a debtor's assets may

---

[4] In *Drinkwater v. American Family Mutual Insurance Co.*, 2006 WI 56, ¶1, 290 Wis. 2d 642, 714 N.W.2d 568, a dispute arose between an insurance company, based in Iowa, and one of its insureds, a Wisconsin resident.  The insurance company argued that Iowa law should apply, and thus the "made-whole doctrine"—a Wisconsin doctrine that Iowa had rejected—did not apply.  *Id.*, ¶¶1, 13.  For support, the insurance company cited a choice of law clause in the insurance contract stating that the policy would be governed by and interpreted in accordance with Iowa law.  *Id.*, ¶¶7, 24.  Our state supreme court did not conduct an analysis like that conducted in *Bush*, *Coady*, *Beilfuss*, and *Cintas Corp.*  The court noted that type of analysis but concluded that it did not apply in that case because: (1) "in Wisconsin the made-whole doctrine trumps an express contract provision to the contrary"; (2) the party arguing against the enforceability of the choice of law provision "had no choice or opportunity to bargain as to the terms of the … contract"; and (3) the issue before the court was not simply one of contract, but also of tort.  *Drinkwater*, 290 Wis. 2d 642, ¶¶29-30.  Thus, the court applied a traditional "choice-of-law analysis to determine if, absent the clause, Wisconsin law would apply."  *Id.*, ¶31.

We do not believe that the *Drinkwater* approach—i.e., not applying the principles espoused in *Bush*, *Coady*, *Beilfuss*, and *Cintas Corp.*—applies in this case because WIS. STAT. § 128.07 does not expressly state that it "trumps an express" choice of law provision and because this is a matter of contract law, not of tort law.  However, we acknowledge that the Receiver, as well as Ridgeway's remaining creditors, did not have an opportunity to bargain for, or against, the choice of law provisions in the MCA contracts.  That said, we think this is a fact that can be sufficiently accounted for in applying the analyses from *Bush*, *Coady*, *Beilfuss*, and *Cintas Corp.*

be liquidated and the proceeds distributed to creditors in an orderly and controlled manner." *Id.*, ¶39. "Although a ch. 128 insolvency proceeding is sometimes referred to as a 'state bankruptcy,' a ch. 128 insolvency proceeding differs from a federal bankruptcy proceeding in significant respects." *BNP Paribas*, 335 Wis. 2d 427, ¶105 (Roggensack, J., concurring) (footnote omitted). One major difference between ch. 128 and federal bankruptcy is that "a debtor's obligations are not discharged in a ch. 128 proceeding. Therefore, when there are insufficient assets to pay all creditors, the debtor's obligation to the creditors remains after the conclusion of a ch. 128 proceeding." *Id.*, ¶105 (Roggensack, J., concurring) (footnote omitted).

¶32 To initiate an assignment under WIS. STAT. ch. 128, "the debtor designates an assignee who files the assignment with the clerk of court." *BNP Paribas*, 335 Wis. 2d 427, ¶40; *see also* WIS. STAT. § 128.02. "Upon the court's approval of an assignment, the assignee is 'vested with the powers of a receiver' and is ordered to 'administer the debtor's estate pursuant to'" ch. 128. *BNP Paribas*, 335 Wis. 2d 427, ¶40 (quoting WIS. STAT. § 128.05(1)). "To effectively administer the debtor's estate, the receiver must determine the debtor's assets and liabilities. Therefore, the receiver is required to file a correct inventory of any assets and a list of creditors, setting forth the amount due each creditor." *Id.*, ¶41 (citing WIS. STAT. § 128.13).

¶33 "Creditors are given notice of the proceedings, and unsecured creditors are required to timely file their claims against the debtor's estate." *Id.*, ¶41; *see also* WIS. STAT. §§ 128.14, 128.15(2). "With permission of the court, the receiver may sell assets and distribute the proceeds of the sale. Often, the proceeds will be insufficient to satisfy all debts and obligations. Accordingly,

WIS. STAT. § 128.17(1) mandates the order of distribution of the proceeds."[5] ***BNP Paribas***, 335 Wis. 2d 427, ¶42.

¶34 Significant to the choice of law analysis in this case, Wisconsin "law favors the equal distribution of assets when creditors cannot be fully paid." ***Freund***, 389 Wis. 2d 35, ¶25; WIS. STAT. § 128.11 ("In all actions authorized by this chapter, appropriate provisional remedies may be had and final relief administered to the equal distribution of all assets recovered among the creditors of the debtor, and the court may make such orders for the payment of costs and expenses as may be just."). "This policy is embedded in WIS. STAT. § 128.07, which allows a receiver, under certain conditions, to recover preferential payments made by a debtor while insolvent." ***Freund***, 389 Wis. 2d 35, ¶25. Specifically, § 128.07(1)(a) states that

> [a] person shall be considered to have given a preference if, being insolvent, the person has made a transfer of any of his or her property, or has procured or permitted a judgment to be entered against him or her in favor of any other person, and the effect of the transfer or the enforcement of the judgment will be to enable any creditor to obtain a greater percentage of his or her debt than any other creditor of the same class.

¶35 A receiver alleging a claim under WIS. STAT. § 128.07 must prove that a preference occurred by showing: "(1) a transfer of property (2) made by an insolvent debtor (3) the effect of which is to allow the recipient creditor to obtain a

---

[5] There are "significant differences" in the treatment of secured creditors and general unsecured creditors under WIS. STAT. ch. 128. ***BNP Paribas v. Olsen's Mill, Inc.***, 2011 WI 61, ¶43, 335 Wis. 2d 427, 799 N.W.2d 792. "Unsecured creditors have no property interest in the debtor's assets, and they cannot withhold consent to the sale of the estate's assets." ***Id.*** Conversely, "[a] secured creditor under ch. 128 cannot have his [or her] security taken away from him [or her] without his [or her] consent." ***Wisconsin Brick & Block Corp. v. Vogel***, 54 Wis. 2d 321, 326, 195 N.W.2d 664 (1972).

greater percentage of his or her debt than other creditors of the same class."[6] *Freund*, 389 Wis. 2d 35, ¶26.

> If the debtor has given a preference within 4 months before the filing of a petition … and the recipient has reasonable cause to believe that the enforcement of the judgment or transfer would effect a preference, the judgment shall be voidable by the receiver or assignee, and the receiver or assignee may recover the property or its value from the recipient.

Sec. 128.07(2). We have interpreted this provision as requiring a receiver to prove that: (1) "the creditor … had reasonable cause to believe the debtor was insolvent at the time of the transfer"; and (2) "the creditor … had reasonable cause to believe that the transfer would put him or her in a preferential position—i.e., the transfer would enable the recipient 'to obtain a greater percentage of his or her debt than any other creditor of the same class.'" *Freund*, 389 Wis. 2d 35, ¶31 (quoting § 128.07(1)(a)).

¶36    "Reasonable cause" "may be established by proof of knowledge of such facts as would lead an ordinarily prudent business [person] to believe the transfer would effect a preference." *Id.*, ¶35 (alteration in original; citation omitted). "The fact finder may consider circumstantial evidence giving rise to an inference that an ordinarily prudent business person would have formed such a belief." *Id.*

> Facts relevant to such a determination can include: (1) the relation of the parties; (2) their intimacy or lack of it; (3) the usual or unusual nature of the transfer; (4) the opportunities of the creditor for knowledge; (5) the participation of the creditor, if any, in the debtor's business;

---

[6] A "transfer" under WIS. STAT. § 128.07 includes "[t]he sale or other disposal of or parting with property, an interest in property or the possession of property." Sec. 128.07(1)(c)1.a.

and (6) the credibility and forthrightness of the witnesses as to the disclosure of relevant facts within their knowledge.

*Id.*

¶37　WISCONSIN STAT. § 128.07 "seeks to prevent a single creditor from diminishing the debtor's assets, to the detriment of other creditors of the same class." *Freund*, 389 Wis. 2d 35, ¶25. Thus, the focus with respect to the choice of law provisions in the MCA contracts is whether Wisconsin's policy of favoring the equal distribution of assets when creditors cannot be fully paid—to the point of allowing a receiver to recover preferential payments—"embodies a public policy so important that [the] parties may not avoid it." *See Cintas Corp.*, 383 Wis. 2d 63, ¶14.

¶38　At the outset, we note that in *Bush* and *Coady*, the legislature expressly provided the purpose of the statutes at issue. *See Bush*, 139 Wis. 2d at 644-45 & n.2; *Coady*, 299 Wis. 2d 420, ¶12. The legislature has not provided a statement of purpose in WIS. STAT. ch. 128 or WIS. STAT. § 128.07. Nevertheless, we conclude that this omission is not dispositive in this case.

¶39　In *Beilfuss*, WIS. STAT. ch. 103 (1995-96) lacked any legislative purpose declaration like those found in *Bush* and *Coady*. Despite the omission, this court stated that the public policy concerning covenants not to compete "can be found in the explicit purpose of WIS. STAT. § 103.465 [(1995-96)]," *see Beilfuss*, 274 Wis. 2d 500, ¶14, which, at the time, provided, in relevant part: "Any such restrictive covenant imposing an unreasonable restraint is illegal, void and unenforceable even as to so much of the covenant or performance as would be a reasonable restraint," § 103.465 (1995-96). Conversely, in *Cintas Corp.*, the common law rule of "strict construction of indemnification

18

promises" obviously lacked any expressed or implied legislative purpose or policy.

¶40    Here, like the policy observed in *Beilfuss*, the policy behind favoring the equal distribution of assets when creditors cannot be fully paid can be found in the explicit purpose of WIS. STAT. § 128.11 ("In all actions authorized by this chapter, appropriate provisional remedies may be had and final relief administered to the equal distribution of all assets recovered among the creditors of the debtor, and the court may make such orders for the payment of costs and expenses as may be just."). This policy is "embedded" in WIS. STAT. § 128.07. *Freund*, 389 Wis. 2d 35, ¶25. Thus, although WIS. STAT. ch. 128 does not include a legislative statement of purpose like those observed in *Bush* or *Coady*, the explicit purpose of the chapter is to favor the equal distribution of assets when creditors cannot be fully paid, and § 128.07 embodies this policy.

¶41    The parties on appeal disagree about whether WIS. STAT. § 128.07 fits within the meaning of a "state bankruptcy law[]," referenced in *Bush*. *See Bush*, 139 Wis. 2d at 643 n.1. Torro contends that it does not, arguing that WIS. STAT. ch. 128 concerns receivership and that "[t]here is no discharge of debt for a company or individual" under that chapter. The Receiver argues, in contrast, that ch. 128, "like bankruptcy, operates broadly and affects the rights of persons beyond the immediate parties to the proceedings—namely, the creditors of the entity subject to receivership."

¶42    We note that the reference to "state bankruptcy laws" in *Bush* was not an adoption of the law review article cited in *Bush* or, more specifically, a determination that the types of law listed in that article necessarily embodied Wisconsin public policies so important that those laws would necessarily trump a

choice of law provision. Rather, the ***Bush*** court appears to have been simply stating the types of laws that courts outside of Wisconsin had generally found to have met that standard. The court emphasized that there is no "precise delineation of those public policies which are sufficiently important to warrant overriding a contractual choice of law" provision, but it stated that, "[i]n general," there is some commonality among such laws. *See **Bush***, 139 Wis. 2d at 643.

¶43    Regardless, we conclude that WIS. STAT. ch. 128 fits within the ambit of a "state bankruptcy law[]" as referenced in ***Bush*** such that this case is one where Wisconsin has a public policy so important that it trumps the choice of law provisions in the MCA contracts. *See **Bush***, 139 Wis. 2d at 643 n.1. Chapter 128 has been referenced as a "state bankruptcy law," despite insolvency proceedings differing from federal bankruptcy proceedings in significant respects. ***BNP Paribas***, 335 Wis. 2d 427, ¶105 (Roggensack, J., concurring) (citation omitted).

¶44    Torro correctly argues that a debtor's obligations cannot be discharged in a WIS. STAT. ch. 128 proceeding. *See **BNP Paribas***, 335 Wis. 2d 427, ¶105 (Roggensack, J., concurring). However, no state bankruptcy law can permit the discharging of debt without unconstitutionally infringing on federal bankruptcy proceedings. *See **Stellwagen v. Clum***, 245 U.S. 605, 615 (1918) ("It is settled that a state may not pass an insolvency law which provides for a discharge of the debtor from his obligations, which shall have the effect of a bankruptcy discharge as to creditors in other states, and this although no general federal bankruptcy act is in effect."); ***International Shoe Co. v. Pinkus***, 278 U.S. 261, 265 (1929) ("Congress did not intend to give insolvent debtors seeking discharge, or their creditors seeking to collect claims, choice between the relief provided by the Bankruptcy Act and that specified in state insolvency laws."); *see also **BNP***

*Paribas*, 335 Wis. 2d 427, ¶105 n.8 (Roggensack, J., concurring). We are unpersuaded by Torro's reliance on ch. 128 not providing for discharge of debt as a basis to conclude that ch. 128 is not a state bankruptcy law where the law fulfills many of the other purposes of a bankruptcy law.

¶45 WISCONSIN STAT. ch. 128 offers an alternative to federal bankruptcy, and WIS. STAT. § 128.07 was enacted, "in large measure[,] based upon" the National Bankruptcy Act of 1893. *Freund*, 389 Wis. 2d 35, ¶29 n.6. Current federal bankruptcy law provides a mechanism similar to § 128.07 by which a bankruptcy trustee may establish and recover preferential transfers. *See* 11 U.S.C. § 547(b); *Ready Fixtures Co. v. Stevens Cabinets*, 488 F. Supp. 2d 787, 789-90 (W.D. Wis. 2007) (outlining the differences between § 128.07 and § 547(b)). Under § 547(b), a bankruptcy trustee may, if specific conditions are met, "avoid certain property transfers made by a debtor within 90 days before bankruptcy."[7] *Union Bank v. Wolas*, 502 U.S. 151, 152, 154-55 (1991). A "preference" under § 547(b) is any "transfer that enables a creditor to receive payment of a greater percentage of his [or her] claim against the debtor than he [or she] would have received if the transfer had not been made and he [or she] had participated in the distribution of" the bankrupt party's assets. *Union Bank*, 502 U.S. at 160-61 (citation omitted). One of the purposes behind § 547(b), similar to § 128.07, is to "facilitate the … policy of equality of distribution among creditors of the debtor." *See Union Bank*, 502 U.S. at 161 (citation omitted).

---

[7] According to one federal district court, WIS. STAT. § 128.07 is not preempted by 11 U.S.C. § 547. *Ready Fixtures Co. v. Stevens Cabinets*, 488 F. Supp. 2d 787, 792 (W.D. Wis. 2007). But "when a bankruptcy petition is filed, federal law trumps state law with respect to the action." *Id.* at 789.

¶46    Therefore, although WIS. STAT. ch. 128 does not allow a debtor to discharge a debt, unlike federal bankruptcy law, it does appear, at least in some form, to mimic federal bankruptcy law by permitting recovery of preferential payments to ensure that a debtor's assets are equally divided among creditors. This conclusion lends support for the proposition that WIS. STAT. § 128.07 fits within the meaning of a "state bankruptcy law[]," as that term is used in *Bush*.

¶47    The law review article cited by *Bush*, which compiled a "survey of decisions" in which "courts have found" that certain laws "embody public policies which warrant overriding … [a] contractual choice of law clause," lends further support for this proposition. *See Bush*, 139 Wis. 2d at 643 n.1. The law review article cited *In re Lea Fabrics, Inc.*, 226 F. Supp. 232 (D.N.J. 1964), as an example of a state bankruptcy law embodying a public policy overriding a choice of law provision. Bauerfeld, *supra*, at 1672-73.

¶48    In *Lea Fabrics*, a New Jersey business was adjudicated bankrupt pursuant to federal bankruptcy procedures, and a trustee was appointed. *Lea Fabrics*, 226 F. Supp. at 234. Prior to the bankruptcy, the business had entered into a written loan agreement with another business whereby the former transferred certain collateral to the latter. *Id.* at 235. The agreement included a choice of law provision, stating that New York state law would govern the transaction. *Id.* The trustee later argued that a transfer of the bankrupt business's collateral to another entity was recoverable under New Jersey law because the trustee was "an ideal lien creditor" under federal bankruptcy law. *Id.* at 234-35. The trustee's "status as an ideal creditor [was] created by the [f]ederal statute, but state law determine[d] what such a creditor [was] entitled to receive." *Id.* at 235. The relevant New Jersey law applied to insolvency and prohibited, with some exceptions, an insolvent corporation from selling, conveying, assigning, or

transferring any of its property. *Id.* at 234 n.2 (citation omitted). Moreover, the law stated that any such sale, conveyance, assignment, or transfer "shall be null and void as against creditors." *Id.* (citation omitted).

¶49 The district court agreed with the trustee, holding that New Jersey law should apply because the choice of law provision contained in the written agreement violated "the public policy of New Jersey whose law would otherwise govern." *Id.* at 237. The court noted that the relevant New Jersey law was enacted "to prevent transfers of an insolvent corporation's assets in fraud of creditors by declaring such transfers null and void as to creditors." *Id.* The court determined that, under the facts of that case, the bankrupt business's creditors "would undoubtedly and reasonably assume that they would be subject to and protected by the laws of the State of New Jersey, and no other state." *Id.* at 236. Because the New Jersey law provided "a clear expression of a fundamental policy of New Jersey," the court concluded that it could not "be circumvented by" the choice of law provision. *Id.* at 237.

¶50 *Lea Fabrics* lends further support for our interpretation of the term "state bankruptcy laws" referenced in *Bush*. That is, *Lea Fabrics* supports the proposition that a state's important public policy of ensuring fairness to creditors—although not necessarily in the "bankruptcy" context, as that term is used in federal law—may overcome a choice of law provision. In *Lea Fabrics*, the New Jersey law concerned a potentially fraudulent transfer of an insolvent corporation's assets. Similarly, WIS. STAT. § 128.07 ensures fairness to creditors and applies to insolvency proceedings in Wisconsin.

¶51 Additionally, and even if WIS. STAT. ch. 128 cannot be seen as a "state bankruptcy law[]," WIS. STAT. § 128.07 "protect[s] a weaker party against

the unfair exercise of superior bargaining power by another party" because it permits a receiver, under certain conditions, to recover preferential payments made while a debtor is insolvent. *See Cintas Corp.*, 383 Wis. 2d 63, ¶14 (citation omitted). Stated differently, § 128.07 effectively prevents a well-placed creditor from obtaining a failing debtor's assets at the expense of other creditors who did not have a choice in the matter. In this sense, § 128.07 provides similar protections as those laws that were held to embody important public policies in *Bush* and *Coady*.

¶52 As this policy is applied to the facts of this case, neither the Receiver nor any of Ridgeway's fifty creditors, aside from Torro, had an opportunity to bargain for or against the preferential payments made to Torro or the choice of law provisions in the MCA contracts. There is nothing in the record to suggest that these parties were even aware of Ridgeway's debt to Torro or were aware that the contracts between the two companies included provisions stating that Utah law, rather than Wisconsin law, would apply. This lack of information is particularly troubling because a large number of Ridgeway's creditors appear to be based in Wisconsin, a fact asserted by the Receiver and not contested by Torro.[8] Therefore, Torro was in a position of superior bargaining power compared to the remaining creditors (and the Receiver).

---

[8] The locations of Ridgeway's creditors were obtained from the electronic docket entries in Ridgeway's receivership case, Brown County case No. 2020CV435, via Wisconsin's Consolidated Court Automation Programs (CCAP). *See* WIS. STAT. § 902.01 ("Judicial notice of adjudicative facts"); *Kirk v. Credit Acceptance Corp.*, 2013 WI App 32, ¶5 n.1, 346 Wis. 2d 635, 829 N.W.2d 522 (taking judicial notice of CCAP records). Some of the creditors do not have addresses listed.

¶53 We note another circumstance in which the policy behind WIS. STAT. ch. 128 could be frustrated by enforcing the choice of law provisions. Some of Ridgeway's creditors are not based in Wisconsin. *See supra* note 8. Assuming for the sake of the analysis that Ridgeway entered into other contracts containing choice of law provisions, and those provisions are enforceable, the Receiver would potentially need to file claims under several different state laws in order to ensure an equal distribution to all creditors. This point is particularly noteworthy because not every state has a statute equivalent to WIS. STAT. § 128.07, and it is unclear whether a Wisconsin receiver, as defined under Wisconsin law, could file a claim similar to § 128.07 under another state's insolvency laws.

¶54 To that end, and consistent with the ***Bush*** and ***Beilfuss*** courts, we consider whether Utah law affords the same protections to creditors and receivers as does Wisconsin law under WIS. STAT. ch. 128. Under Title 6 of the Utah Code, titled "Assignment for the Benefit of Creditors," "[a]n insolvent debtor may, in good faith, execute an assignment of property to one or more assignees in trust for the benefit of creditors in conformity with the provisions of this title." UTAH CODE ANN. § 6-1-1 (West 2024).[9] Importantly, however, Utah law provides a right to prefer creditors, stating:

> Nothing in this title contained shall affect the power of a person, although insolvent, residing either within or without this state, to transfer property in this state in good faith to a particular creditor for the purpose of paying or securing the whole or a part of a debt owing to such creditor; provided, that joint, or joint and several, debtors can prefer their joint creditors only out of joint property, and can prefer the individual creditors of each only out of the separate property of each.

---

[9] All references to the Utah Code Annotated are to West 2024 version unless otherwise noted.

Sec. 6-1-20. The Receiver argues that Utah law therefore expressly permits a debtor assigning its assets for the benefit of creditors to prefer some creditors over others. Torro failed to reply to the Receiver's argument surrounding § 6-1-20, and we take that lack of reply as a concession. *See **United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578.

¶55 Torro instead argues that "both Utah and Wisconsin law contain statutory mechanisms that are substantially similar to the preferential transfer claim outlined in WIS. STAT. § 128.07 to protect creditors." Specifically, Torro cites Utah's Uniform Voidable Transactions Act (UVTA), which "affords remedies for 'creditors' against 'debtors' who have engaged in fraudulent transfers of property" and permits a creditor to "seek to undo or void a debtor's transfer, for example, that fraudulently 'plac[es] assets beyond [the] creditors' reach.'" *See **Eskelsen v. Theta Inv. Co.***, 2019 UT App 1, ¶24, 437 P.3d 1274 (alterations in original; citations omitted);[10] *see also* UTAH CODE ANN. § 25-6-101. A "creditor" is defined as "a person that has a claim." UTAH CODE ANN. § 25-6-102(4). A "claim" "means a right to payment, whether or not the right is

---

[10] The ***Eskelsen*** court discussed the former version of the UVTA, the Uniform Fraudulent Transfer Act. *See **Eskelsen v. Theta Inv. Co.***, 2019 UT App 1, ¶24, 437 P.3d 1274. In 2017, "the Utah Legislature … amended, repealed, renumbered, and renamed its version of the law, which is now known as the [UVTA]." ***JENCO LC v. SJI LLC***, 2023 UT App 151, ¶19 n.4, 541 P.3d 321. The relevant provisions of the statutes remain substantially similar. *Compare* UTAH CODE ANN. § 25-6-202, *with* UTAH CODE ANN. § 25-6-5 (West 2016).

Both the UVTA and Wisconsin's equivalent, the Uniform Voidable Transactions Law (UVTL), were adopted from the Uniform Law Commission's Uniform Fraudulent Transfer Act. *See **Official Comm. of Unsecured Creditors of Great Lakes Quick Lube LP v. Theisen***, 2018 WI App 70, ¶15, 384 Wis. 2d 580, 920 N.W.2d 356; 2023 Wis. Act 246 (renaming the former version of the law to the UVTL and making other changes); ***JENCO***, 2023 UT App 151, ¶19 n.4. The UVTL provides a similar framework for creditor claims as Utah's UVTA. *Compare* WIS. STAT. §§ 242.04, 242.05, 242.07, *with* UTAH CODE ANN. § 25-6-202; *see also **Beck v. BidRX, LLC***, 2018 WI App 61, ¶15, 384 Wis. 2d 207, 918 N.W.2d 96.

reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Sec. 25-6-102(3).

¶56 "Like a preference, a fraudulent transfer involves a pre-bankruptcy (or pre-insolvency) conveyance by a debtor to a third party."[11] *Ready Fixtures*, 488 F. Supp. 2d at 791. "Generally, a fraudulent transfer occurs when a debtor (a) transfers property with actual intent to hinder, delay, or defraud any creditor, or (b) transfers property under specified circumstances without receiving reasonably equivalent value in exchange." *Eskelsen*, 437 P.3d at 1281 (citation omitted); UTAH CODE ANN. §§ 25-6-202, 203. To determine "actual intent," § 25-6-202(2) provides eleven nonexclusive factors, including whether: "the transfer or obligation was disclosed or concealed"; "the transfer was of substantially all the debtor's assets"; "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred"; and "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred."

¶57 We agree with the Receiver that establishing that a transaction is voidable under the UVTA requires proof of elements wholly different from those found in WIS. STAT. § 128.07. Like WIS. STAT. ch. 242, UTAH CODE ANN. § 25-6-202, provides a cause of action for *creditors* against *debtors*. Conversely, § 128.07 provides a cause of action for a *receiver* against a *creditor*. It is unclear whether the Receiver could qualify as a "creditor" under UTAH CODE ANN.

---

[11] Federal bankruptcy provisions include a remedy for the recovery of fraudulent transfers. *See* 11 U.S.C. § 548.

§ 25-6-102(4)—i.e., whether the Receiver has a right to payment, *see* § 25-6-102(3). More importantly, under § 128.07, a receiver must show, among other things, that "the creditor … had reasonable cause to believe that the transfer would put him or her in a preferential position—i.e., the transfer would enable the recipient 'to obtain a greater percentage of his or her debt than any other creditor of the same class.'" *Freund*, 389 Wis. 2d 35, ¶31 (citation omitted). To the contrary, under UTAH CODE ANN. §§ 25-6-202 or 203, a creditor must show that the debtor acted with intent to hinder, delay, or defraud a creditor or that the transfer was made under specified circumstances without receiving reasonably equivalent value in exchange. *See id.*; *Eskelsen*, 437 P.3d at 1281; *see also Butler v. Wilkinson*, 740 P.2d 1244, 1261 (Utah 1987) (holding that under a prior version of the UVTA, "[p]roof that a transferee of property knows that the transferor-debtor has preferred the transferee over other creditors or that the transferee actively sought the preference from the debtor does not support the conclusion that the transferee lacks good faith"). While the elements of proof under the UVTA may be similar to Wisconsin's UVTL, they are distinctly different from those in § 128.07.

¶58 Because Utah law permits the preferential transfer of assets to creditors and does not offer a similar alternative to WIS. STAT. § 128.07, Utah law does not afford as much protection to creditors as Wisconsin law. *See Bush*, 139 Wis. 2d at 641; *Beilfuss*, 274 Wis. 2d 500, ¶15. In other words, the Receiver would not be able to file a similar claim if the choice of law provisions were enforceable and Utah law applied.

¶59 Lastly, a state's important public policy will trump a choice of law provision only if the state's "law would be applicable if the parties['] choice of law provision were disregarded."[12] ***Bush***, 139 Wis. 2d at 642; ***Coady***, 299 Wis. 2d 420, ¶¶13-17. Neither party on appeal adequately sets forth the proper choice of law analysis that we should apply in this case. We therefore apply the analysis from ***Drinkwater***.

¶60 The first rule in the choice of law analysis is "that the law of the forum should presumptively apply unless it becomes clear that nonforum contacts are of the greater significance." ***Drinkwater***, 290 Wis. 2d 642, ¶40 (citation omitted). This rule is particularly important in this case, where the legislature has specifically provided that "[t]he circuit courts shall have supervision of proceedings under [WIS. STAT. ch. 128] and may make all necessary orders and judgments therefor; and all assignments for the benefit of creditors shall be subject to this chapter." *See* WIS. STAT. § 128.01.

¶61 The ***Drinkwater*** court then considered whether the nonforum contacts are of "greater significance." ***Drinkwater***, 290 Wis. 2d 642, ¶42. Stated differently, the court framed the issue as whether the nonforum state's contacts are "so obviously limited and minimal that application of that state's law constitutes officious intermeddling." ***Id.*** (citation omitted). "[I]f it is not clear that the

---

[12] This issue was not analyzed in ***Bush*** because the party attempting to enforce the choice of law provision did "not argue that absent an effective choice of law provision Minnesota law would still apply." ***Bush v. National Sch. Studios, Inc.***, 139 Wis. 2d 635, 645, 407 N.W.2d 883 (1987). Further, this court in ***Beilfuss*** did not expressly address whether Wisconsin law would apply absent the choice of law provision; however, the court made it clear that Wisconsin law would control after determining that the provision was unenforceable. *See* ***Beilfuss***, 274 Wis. 2d 500, ¶18. In ***Cintas Corp.***, this court did not address whether Wisconsin law would apply absent the choice of law provision because it determined that the choice of law provision was enforceable and that Ohio law applied. *See generally* ***Cintas Corp.***, 383 Wis. 2d 63.

nonforum contacts are of greater significance, then the court applies five choice-influencing factors." *Id.*, ¶40. These are: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum government's interests; and (5) application of the better rule of law. *Id.*

¶62 Here, the MCA contracts were entered into by a Utah entity and a Wisconsin entity. The purpose of the MCA contracts was to secure funds based in Utah for Ridgeway's Wisconsin operations. According to the second MCA contract, the "transaction contemplated … was negotiated" and "carried out" in Utah. If this were a lawsuit between Ridgeway and Torro, Utah's contacts might very well overcome Wisconsin's contacts. However, this action concerns WIS. STAT. § 128.07, is between the Receiver and Torro, and is the result of Ridgeway's alleged insolvency in Wisconsin. We conclude, therefore, that it is not "clear" whether Wisconsin or Utah has contacts that are of "greater significance." *See Drinkwater*, 290 Wis. 2d 642, ¶¶40, 43.

¶63 Because the contacts analysis does not produce a clear conclusion favoring one forum over the other, we apply the choice-influencing factors that we believe warrant consideration. *See Drinkwater*, 290 Wis. 2d 642, ¶45. Like the court in *Drinkwater*, we acknowledge that whether the application of Utah law or Wisconsin law "is more likely to lead to predictable and expected results under the facts of this case depends on which party's perspective on predictability and expectations is considered." *See id.*, ¶46. On the one hand, the application of Utah law is consistent with Torro's expectation that Utah law would control any disputes that arose between it and Ridgeway concerning the payments.

¶64 On the other hand, the dispute in this case centers on whether Ridgeway's repayment to Torro is recoverable by the Receiver so that the Receiver can ensure the equal distribution of Ridgeway's remaining assets. Assuming that Ridgeway's repayments to Torro fall under WIS. STAT. § 128.07, Ridgeway's Wisconsin creditors certainly have an expectation that that money will be recoverable pursuant to Wisconsin's policy of favoring the equal distribution of assets when creditors cannot be fully paid. If Utah law were to apply and if Ridgeway's repayments to Torro fall under § 128.07, the Wisconsin creditors would likely never receive any benefit from Ridgeway's preferential payments to Torro because Utah does not recognize a claim similar to one under § 128.07.

¶65 Furthermore, and most importantly, applying Wisconsin law in this case advances the forum's governmental interests because the legislature has made it an important public policy of this state to favor the equal distribution of assets when creditors cannot be fully paid when an entity is insolvent. Again, Utah law does not have such a policy and does not recognize a claim for preferential payments.[13] *See* ***Drinkwater***, 290 Wis. 2d 642, ¶58.

---

[13] We do not afford any weight to the second, third, or fourth choice-influencing factors in this case. First, both jurisdictions are "more than minimally concerned," and the application of one forum's laws over the other's does not maintain interstate order. *See* ***Drinkwater***, 290 Wis. 2d 642, ¶¶50-52. Second, simplification of the judicial task concerns application of the forum or nonforum's laws. ***Id.***, ¶53. Here, if we conclude that the choice of law provisions are unenforceable, then so too are the forum selection provisions. Thus, this factor necessarily depends on the outcome of our analysis, but it is not helpful to the analysis itself. In other words, if the provisions are enforceable, Utah would apply Utah law. If they are not enforceable, Wisconsin would apply Wisconsin law. Lastly, we cannot say that Wisconsin's law permitting the recovery of preferential payments is better than Utah's law of not allowing such recovery. That is, we cannot say that Utah's law is "anachronistic or fails to reflect modern trends." *See* ***State Farm Mut. Auto. Ins. Co. v. Gillette***, 2002 WI 31, ¶66, 251 Wis. 2d 561, 641 N.W.2d 662.

¶66    We therefore conclude that absent the choice of law provisions in the MCA contracts, Wisconsin law would apply.  We reach this conclusion after considering the presumption that Wisconsin law should apply because it is not clear that Utah's contacts are of greater significance and after considering the relevant choice-influencing factors.

**CONCLUSION**

¶67    Wisconsin undoubtedly has a public policy under WIS. STAT. ch. 128 of favoring the equal distribution of assets when creditors cannot be fully paid.  This policy is "embedded" in WIS. STAT. § 128.07, which allows a receiver to recover preferential payments made by a debtor while insolvent to prevent a single creditor from diminishing a debtor's assets, to the detriment of other creditors of the same class.  *Freund*, 389 Wis. 2d 35, ¶25.  We interpret this policy as "protect[ing] a weaker party against the unfair exercise of superior bargaining power by another party."  *See Cintas Corp.*, 383 Wis. 2d 63, ¶14 (citation omitted).  Utah law does not afford similar protections to creditors who were not privy to negotiations underlying the alleged preferential payments.

¶68    Consequently, this public policy is "important" and trumps the choice of law provisions in the MCA contracts.  Moreover, Wisconsin law applies absent the choice of law provisions.  Because the choice of law provisions are unenforceable as contrary to an important public policy of this state, the presumptively enforceable forum selection provisions are also unenforceable.  *See Beilfuss*, 274 Wis. 2d 500, ¶¶13, 16-18.  For these reasons, we reverse the circuit court's order dismissing the present action, and we remand for further proceedings.

*By the Court.*—Order reversed and cause remanded.

Recommended for publication in the official reports.